**FIFTH DIVISION**
**PHIPPS, P. J.,**
**DILLARD and PETERSON, JJ.**

**NOTICE: Motions for reconsideration must be**
*physically received* **in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**June 21, 2016**

# In the Court of Appeals of Georgia

A16A0056. STONE MOUNTAIN MEMORIAL ASSOCIATION v.
  AMESTOY.

DILLARD, Judge.

Stone Mountain Memorial Association ("SMMA") appeals from the trial court's denial of its motion for summary judgment in a premises-liability and wrongful-death action brought by Nancy Amestoy following her husband Martin's tragic death in a bicycling accident at Stone Mountain Park. Specifically, SMMA contends that the trial court erred in denying its motion for summary judgment because it is immune from liability under the Recreational Property Act ("RPA").[1] Because we agree with SMMA that the RPA immunizes it from liability, we reverse.

---

[1] *See* OCGA § 51-3-20 *et seq.*; *see also* OCGA § 51-3-20 ("The purpose of this article is to encourage owners of land to make land and water areas available to the public for recreational purposes by limiting the owners' liability toward persons entering thereon for recreational purposes.").

Viewed in the light most favorable to Nancy Amestoy (*i.e.*, the nonmoving party),[2] the record reflects that between 7:30 and 7:45 a.m. on the day in question, officers with SMMA's public-safety department engaged in temporary traffic-control efforts on portions of Stone Mountain Park's Robert E. Lee Boulevard in anticipation of a 5k walk/run event that was scheduled to begin at 8:00 a.m. These temporary traffic-control efforts consisted of two saw-horse style barricades placed side-by-side across the road's southbound lanes, spanning approximately ten-feet wide with an approximately one-and-a-half foot gap between them. Both barricades bore orange and white stripes and "do not enter" signs.

The SMMA major stationed at these barricades manned the post for a few minutes after they were erected, but he left suddenly when overcome by an urgent need to use the restroom. While the major was in the restroom, the SMMA captain—who was stationed at a separate traffic-control post—saw two bicyclists maneuver around the barricades at the major's post. Then, six or seven minutes later, Martin Amestoy was observed riding his bicycle toward the barricades at what a witness believed was a "safe, normal speed"; however, Amestoy's head was down. Amestoy then traveled between the barricades, striking the inside corner of the

---

[2] *See, e.g.*, *Holcomb v. Long*, 329 Ga. App. 515, 517 (765 SE2d 687) (2014).

2

lefthand barricade with his handlebar, and was thrown forward off of his bike.[3]

Although he was wearing a helmet, Amestoy suffered severe head trauma and died

later that day.

Thereafter, Nancy Amestoy filed suit against SMMA in her capacity as

surviving spouse and on behalf of Martin's estate. In doing so, she asserted that

SMMA (1) was liable for Martin's death due to its failure to warn of the allegedly

dangerous condition of the barricades, (2) had actual knowledge that the barricades

posed a risk of serious bodily injury or death, and (3) willfully failed to warn of the

alleged danger (despite knowing of the risk posed by the barricades). SMMA

responded and filed a motion for summary judgment, contending that it was immune

from suit under the RPA. The trial court ultimately denied SMMA's motion when it

concluded that genuine issues of material fact remained as to whether (1) the

barricades were a dangerous condition and (2) SMMA had actual knowledge that this

condition was dangerous. The trial court did, however, certify the denial of SMMA's

_____

[3] Nancy Amestoy alleges that her husband may have been attempting to avoid a collision with the barricades by trying to ride between them. Officers could not speak to Martin after the collision to ascertain his version of events because he was unconscious. But Nancy's expert opined that "once [Martin] was aware of [the barricades,] his only path of travel was between the two barricades."

motion for immediate review, and this Court granted SMMA's application for interlocutory appeal. This appeal follows.

At the outset, we note that on appeal from the denial of a motion for summary judgment, we conduct a *de novo* review of the record.[4] To prevail on a motion for summary judgment, the moving party must demonstrate that there is no genuine dispute of material fact, and that the undisputed facts, viewed in the light most favorable to the nonmovant, entitle the moving party to judgment as a matter of law.[5] A defendant may do this by showing the trial court that the record reveals no evidence sufficient to create a jury issue on at least one essential element of the plaintiff's case.[6] Indeed, if there is no evidence sufficient to create a genuine issue of material fact as to "any essential element of the plaintiff's claim, that claim tumbles like a

---

[4] *See Gayle v. Frank Callen Boys & Girls Club, Inc.*, 322 Ga. App. 412, 412 (745 SE2d 695) (2013) ("A de novo standard of review applies to an appeal from a grant [or denial] of summary judgment[.]" (punctuation omitted)).

[5] *See id.* ("Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." (punctuation omitted)).

[6] *See Farris v. First Fin. Bank*, 313 Ga. App. 460, 462 (722 SE2d 89) (2011) ("This burden is met by a defendant when the court is shown that the documents, affidavits, depositions and other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of the plaintiff's case." (punctuation omitted)).

4

house of cards."[7] With these guiding principles in mind, we turn now to SMMA's arguments on appeal.

SMMA argues that the trial court erred in denying its motion for summary judgment based upon immunity under the RPA because (1) there was no evidence that it had actual knowledge of a dangerous condition, (2) the allegedly dangerous condition was open and obvious as a matter of law, and (3) there was no evidence that it willfully failed to warn of the allegedly dangerous condition. Because the allegedly dangerous condition—*i.e.*, the barricades blocking the southbound lanes of Robert E. Lee Boulevard—was open and obvious as a matter of law, SMMA was entitled to summary judgment.

In enacting the RPA, the General Assembly sought to "encourage property owners to make their property available to the public for recreational purposes by limiting the owners' liability."[8] In this regard, OCGA § 51-3-22 provides that "an

[7] *La Quinta Inns, Inc. v. Leech*, 289 Ga. App. 812, 812 (658 SE2d 637) (2008) (punctuation omitted).

[8] *Gayle*, 322 Ga. App. at 413 (punctuation omitted). The RPA applies when the property is "open to the public for recreational purposes and the owner does not charge an admission fee." *Id.* It is undisputed between the parties that Stone Mountain Park is open to the public for recreational purposes and does not charge an admission fee. *See* OCGA § 51-3-21 (a) ("'Charge' means the admission price or fee asked in return for invitation or permission to enter or go upon the land."); *see also Hogue v.*

5

owner of land owes no duty of care to keep the premises safe for entry or use by others for recreational purposes or to give any warning of a dangerous condition, use, structure, or activity on the premises to persons entering for recreational purposes."

Notwithstanding the RPA's general provision for immunity from liability, there is an exception "[f]or willful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity."[9] But as we have previously held, "willful failure" involves "a conscious, knowing, voluntary, intentional failure, rather than a mere inadvertent, accidental, involuntary, inattentive, inert, or passive omission."[10] And malice requires either "an actual intent to cause the particular harm produced or the wanton and [willful] doing of the act with an awareness of the plain

---

*Stone Mtn. Mem. Ass'n*, 183 Ga. App. 378, 380 (1) (358 SE2d 852) (1987) (holding that initial motor-vehicle fee was "a permit for the use of a vehicle in the park" and that "the trial court was authorized to conclude as a matter of law that this fee did not constitute a charge for the recreational use of the parkland itself").

[9] OCGA § 51-3-25 (1); *see also Gayle*, 322 Ga. App. at 415.

[10] *Collins v. City of Summerville*, 284 Ga. App. 54, 56 (643 SE2d 305) (2007) (punctuation omitted); *accord Cooley v. City of Carrollton*, 249 Ga. App. 387, 388 (547 SE2d 689) (2001); *Spivey v. City of Baxley*, 210 Ga. App. 772, 773 (1) (437 SE2d 623) (1993).

and strong likelihood that harm may result."[11] Thus, in order for the "willful or malicious failure" exception to apply, Nancy Amestoy must show that the property owner (SMMA) had *actual knowledge* that (1) the property was being used for recreational purposes;[12] (2) a condition existed involving unreasonable risk of death or serious bodily harm; (3) the condition was not apparent to those using the property; and (4) having the foregoing knowledge, the property owner chose not to warn users in disregard of the possible consequences.[13] Constructive knowledge is insufficient to meet this burden of proof, and the property owner has no duty to inspect the

---

[11] *Collins*, 294 Ga. App. at 56 (punctuation omitted); *accord Gayle*, 322 Ga. App. at 415.

[12] The parties do not dispute that the first prong of this test is satisfied.

[13] *See Gayle*, 322 Ga. App. at 415 (listing the four requirements); *Collins*, 284 Ga. App. at 56 (same); *Spivey*, 210 Ga. App. at 773 (1) (same); *Quick v. Stone Mtn. Mem. Ass'n*, 204 Ga. App. 598, 599 (420 SE2d 36) (1992) (same); *see also Edmondson v. Brooks Cty. Bd. of Educ.*, 205 Ga. App. 662, 663 (423 SE2d 413) (1992) (noting that, in the fourth prong, "'[t]his knowledge' refers to the three previously listed facts of which the owner must have actual knowledge in order to be liable for 'choosing not to guard or warn'" (punctuation omitted)).

7

property.[14] Importantly, the plaintiff must satisfy *each prong* of this four-part test to succeed against a recreational property owner under this exception.[15]

At the outset, we reject any suggestion that the four-part test does not require *actual knowledge* as to each prong. Although we have not always been precise in our recitation of the analytical framework,[16] the notion that actual knowledge is not required by the foregoing four-part test is belied by the plain language of the test adopted by this Court in *McGruder v. Georgia Power Co.*,[17] by our explanation and

---

[14] *See Collins*, 284 Ga. App. at 56 ("Constructive knowledge is not sufficient, and no duty to inspect is imposed on the property owner."); *Ga. Dep't of Transp. v. Thompson*, 270 Ga. App. 265, 269 (2) (a) (606 SE2d 323) (2004) ("This test excludes either constructive knowledge or a duty to inspect." (punctuation omitted)).

[15] *See, e.g.*, *Lee v. Dep't of Nat'l Res.*, 263 Ga. App. 491, 493-95 (3) (588 SE2d 260) (2003) (holding that, despite uncontroverted satisfaction of first prong, failure to satisfy other prongs was fatal to claim); *Edmondson*, 205 Ga. App. at 663 (noting that, in holding that RPA immunized defendant from liability, the issue of liability under the RPA is "resolved by a four-part test" and the defendants "rel[ied] on the absence of the third prong of the test").

[16] *See Gayle*, 322 Ga. App. at 415; *Collins*, 284 Ga. App. at 56; *Norton v. Cobb Cty.*, 284 Ga. App. 303, 307 (3) (643 SE2d 803) (2007) (physical precedent only).

[17] 126 Ga. App. 562, 563-64 (1) (191 SE2d 305) (1972) ("In the context of the whole statute, it would seem that a wilful failure to guard or warn would require actual knowledge of the owner that its property is being used for recreational purposes; that a condition exists involving an unreasonable risk of death or serious bodily harm; that the condition is not apparent to those using the property; and that having this knowledge, the owner chooses not to guard or warn, in disregard of the

8

application of the test in subsequent cases,[18] and even by other jurisdictions that have construed the test employed in Georgia.[19] And here, Nancy Amestoy failed to produce any evidence to create a jury question as to the third prong of the test—that is, that SMMA had *actual knowledge* that the barricades were not apparent to those using the property.[20] As the trial court noted in its order, the road leading up to the barricades

possible consequences."), *reversed on other grounds by* 229 Ga. 811 (194 SE2d 440) (1972); *see also Ga. Marble Co. v. Warren*, 183 Ga. App. 866, 867 (1) (360 SE2d 286) (1987) (adopting the four-part test as previously set forth in *McGruder v. Ga. Power Co.*, and noting that "[a]lthough the test was turned into dicta by the Supreme Court's ruling that the RPA was not applicable in that case, it is sound").

[18] *See Ray v. Ga. Dep't of Nat'l Res.*, 296 Ga. App. 700, 702 (1) (675 SE2d 585) (2009); *Lee*, 263 Ga. App. at 493-94 (3); *Thompson*, 270 Ga. App. at 269 (2) (a); *S. Gwinnett Athletic Ass'n, Inc. v. Nash*, 220 Ga. App. 116, 119 (1) (469 SE2d 276) (1996); *Spivey*, 210 Ga. App. at 773; *Quick*, 204 Ga. App. at 599; *Edmondson*, 205 Ga. App. at 663; *Warren*, 183 Ga. App. at 867 (1).

[19] *Hendrickson v. Ga. Power Co.*, 80 FSupp2d 1374, 1379 (III) (B) (M.D. Ga. 2000) (acknowledging that this Court uses a four-part test, and reciting test so as to make clear that defendant must have "actual knowledge" as to the first three prongs); *Ex parte City of Geneva*, 707 So2d 626, 629 n.2 (Ala. 1997) (construing Alabama's recreational-use statute and observing that "the four-part 'actual knowledge' test of [Ala. Code] § 35-15-24 [(which applies 'actual knowledge' to the first three prongs of test)] appears likely to be a codification of the test employed by the state courts of Georgia when determining whether a noncommercial recreational landowner may be liable for 'willful . . . failure to guard or warn against a dangerous condition, use, structure, or activity.'").

[20] *See Ray*, 296 Ga. App. at 702 (2) ("The . . . third prong of this test was not met, because no evidence was presented that appellees had actual knowledge of a

9

is straight and open. Indeed, witnesses observed two other cyclists negotiate their bicycles around the barricades only minutes before Martin Amestoy's accident. Additionally, not only does the photographic evidence demonstrate that the barricades were highly visible, but testimony by numerous SMMA public-safety personnel established that they believed this to be the case.

The testimony from SMMA personnel included that of a corporal who assisted in the investigation after the accident, and who testified that (1) the "barricades were plainly visible for quite a distance," (2) the barricades were visible "for hundreds of feet," (3) the sun was shining on the morning in question, and (4) there was "a great deal of visibility." Likewise, an SMMA officer who performed an accident investigation, including taking various measurements to construct a to-scale diagram and conducting a "conspicuity test," estimated that the barricades would have been visible from "a couple hundred yards" up Robert E. Lee Boulevard. More specifically,

---

condition that was not apparent to persons using the property."); *Nash*, 220 Ga. App. at 119 (1) (reversing denial of motion for summary judgment when, *inter alia*, "even assuming for the sake of argument that the unfinished bleachers presented a dangerous condition, there is no evidence that the [defendant] had any knowledge that this condition was not apparent to people using the property"); *Edmondson*, 205 Ga. App. at 663 ("[The third] prong requires plaintiffs to show that defendants actually knew that the dangerous condition of the merry-go-round was not apparent to those using the playground.").

the major who was stationed at the barricades estimated that the distance at which they were visible would have been 200 to 250 feet, though he did acknowledge that on the morning in question, "[t]he way the sun was up, [a cyclist or motorist] would possibly [have] been looking into the sun." Lastly, the SMMA captain calculated that the distance from the first line of sight to the barricades was one-tenth of a mile, or 528 feet, concluding that the barricades were "highly visible." The captain also echoed other testimony that "[i]t was a clear day, the sun was out, [and] visibility was good."

Finally, Nancy Amestoy's expert testified that from his position and speed on a bicycle, Martin Amestoy likely would have seen the *gap* between the barricades when he was approximately fifteen feet away, giving him about one-half of a second to react. But when questioned about the distance from which the barricades *themselves* would have been visible, the expert testified that he did not "have an answer for that" and that he did not "know how far back they would have been seen," though he opined that it would not have been "very far." He also testified that he had no way of knowing what Martin Amestoy was doing "10, 20, [or] 50 feet prior to the barricades."

11

Considering the above testimony, Nancy Amestoy presented no evidence that SMMA had actual knowledge that the barricades were not apparent to park users when they were open and obvious,[21] as overwhelmingly demonstrated by the foregoing testimony and photographic evidence.[22] Indeed, as previously noted, there

[21] *Cf. Turkette v. Cent. of Ga. Ry. Co.*, 117 Ga. App. 617, 617 (161 SE2d 362) (1968) (holding that court erred in dismissing petition alleging negligence when plaintiff collided with warning device placed in roadway by defendant while traveling in the dark, in the rain, and under circumstances of poor visibility; and obstruction was unlighted, obscured from plaintiff's vision by its placement, and could not be seen until within 10 feet); *Rogers v. Johnson*, 94 Ga. App. 666, 666 (syllabus), 680 (1), 683 (3) (96 SE2d 285) (1956) (sustaining verdict for plaintiff when decedent was traveling roadway at night in car that collided with defendant's vehicle, which was hauling house-trailer, nearly blocking the entire roadway after making a lefthand turn); *Trammell v. Matthews*, 84 Ga. App. 332, 338-39 (1) (66 SE2d 183) (1951) (holding that there was a question for the jury as to negligence when plaintiff alleged, *inter alia*, "that had the defendant placed proper warnings at the point where the detour went around the place where the bridge was out the driver of the car . . . would not have passed the detour and gone through the partial road block and then into the place where the bridge was out," and when it appeared from the plaintiff's petition "that the way ahead of the driver of this car was not clear, that it was yet dark, and the road was not straight as one approached this partial road block from the [s]outh; that the detour was the same color as the paved road; [and] that the partial road block was not sufficient and adequate to prevent one from assuming that the road could be used").

[22] *See Metro. Atlanta Rapid Transit Auth. v. Fife*, 220 Ga. App. 298, 299, 300 (1) (469 SE2d 420) (1996) (noting that photographic evidence showed that allegedly dangerous condition of drainage culvert was "plainly visible to anyone standing at the curb," and holding that condition was open and obvious); *Warren*, 183 Ga. App. at 867 (1) ("Photographs of the stream illustrate that even a first time visitor to the stream would perceive that the stream's bed was or at least was likely to be rocky. .

12

is no evidence that SMMA officials *knew* that the barricades were not apparent.[23]

Although Nancy Amestoy claims that SMMA stationed a major at the barricades to provide warnings to approaching motorists and bicyclists and that this officer had actual knowledge of the need to provide such warnings, there is no evidence to substantiate these assertions. Instead, the major testified that the objective of his post was to "turn the cars around, bicyclists around." Additionally, the SMMA captain testified that the purpose of the major's post was "to block the road, to keep cars from going down into that area where the people would be crossing" and "protect the *walkers*,"[24] not to "protect bicyclists and cars." And when further asked if there was

---

. . The rocky condition of the terrain in and about the stream was open and obvious."); *see also Engelson v. Little Falls Area Chamber of Commerce*, No. Civ.01–102, 2002 WL 31689432, at \*3 (3) (D. Minn. 2002) (noting, in case involving a plaintiff who tripped over an orange traffic cone, that "[t]he test for obviousness is an objective test that examines whether the danger was in fact visible, rather than whether the injured party actually saw the danger," and concluding that not only were traffic cones obvious but that defendants "could not have anticipated harm from the cones because traffic cones are, themselves, warning markers").

[23] *See Ray*, 296 Ga. App. at 702 (1) ("The . . . third prong of this test was not met, because no evidence was presented that appellees had actual knowledge of a condition that was not apparent to persons using the property."); *Edmondson*, 205 Ga. App. at 663 ("[The third] prong requires plaintiffs to show that defendants actually knew that the dangerous condition of the merry-go-round was not apparent to those using the playground.").

[24] (Emphasis supplied.)

13

"any interest in protecting the bicyclists or the vehicles from entering that area," the captain responded that "[o]ur objective is to protect everybody in the park." But this diplomatic answer is a far cry from testimony that would create a genuine issue of material fact as to whether SMMA officials had *actual knowledge* that the barricades themselves were not apparent—or open and obvious—to park users.

Furthermore, even if we were to assume that Martin Amestoy could not see the barricades from his position and speed on his bicycle or due to the sun's location at the exact moment of his accident on the morning in question, whether a dangerous condition is open and obvious depends on the objective knowledge of a reasonable person, not on the plaintiff's subjective knowledge.[25]

---

[25] *See Morris v. Clark Equip. Co.*, 904 FSupp. 1379, 1383 (II) (M.D. Ga. 1995) ("In determining whether a danger was open and obvious to the injured party, the court should use an objective point of view, as opposed to subjective, since the user's perceptions are irrelevant."); *see also Weatherby v. Honda Motor Co.*, 195 Ga. App. 169, 171 (393 SE2d 64) (1990) ("In determining, under the 'open and obvious rule,' whether the peril from which an injury results is latent or patent, the decision is made on the basis of an objective view . . . , and the subjective perceptions of the user or injured party are irrelevant."), *overruled on other grounds by Ogletree v. Navistar Intern. Transp. Corp.*, 269 Ga. 443, 443-44 (500 SE2d 570) (1998) (holding that "open and obvious danger" rule is not applicable in cases of alleged design defect). *See generally* 62A AM. JUR. 2D *Premises Liability* § 713 (2016) ("Whether a condition is open and obvious, for premises liability purposes, depends on the objective knowledge of a reasonable person, not the plaintiff's subjective knowledge. The test for what constitutes an 'obvious' danger is an objective test: the question is not whether the injured party actually saw the danger, but whether it was in fact

In light of the foregoing, we must reverse the trial court's denial of SMMA's motion for summary judgment.[26]

*Judgment reversed. Phipps, P. J., and Peterson, J., concur*.

---

visible." (footnotes omitted)).

[26] *See Nash*, 220 Ga. App. at 119 (1) (reversing denial of motion for summary judgment when, *inter alia*, "even assuming for the sake of argument that the unfinished bleachers presented a dangerous condition, there is no evidence that the [defendant] had any knowledge that this condition was not apparent to people using the property").