[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-11842
Non-Argument Calendar

_____

D.C. Docket No. 1:15-cv-01482-CC

STEVEN SHAW,
JEANENNE SHAW,

Plaintiffs - Appellants,

versus

UNITED STATES OF AMERICA,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(February 20, 2018)

Before MARCUS, ROSENBAUM, and FAY, Circuit Judges.

PER CURIAM:

Steven and Jeanenne Shaw appeal from the district court's grant of the United States's motion for summary judgment in a premises-liability action brought by the Shaws after Steven Shaw ("Shaw") was seriously injured in a bicycling accident at Kennesaw Mountain National Battlefield Park ("Kennesaw Mountain Park" or the "Park"). The Shaws alleged that the accident was caused by a dangerous road condition of which Park officials knew and failed to warn or guard. The district court found that the United States was immune from liability under Georgia's Recreational Property Act, O.C.G.A. §§ 51-3-20 to -26. The Shaws argue on appeal that genuine issues of material fact preclude summary judgment. We agree and therefore vacate and remand for further proceedings.

## I.

We present the relevant facts in the light most favorable to the Shaws, the non-moving parties at summary judgment. *See Melton v. Abston*, 841 F.3d 1207, 1219 (11th Cir. 2016) (stating that we "consider[] the facts and draw[] all reasonable inferences in the light most favorable to the non-moving party" at summary judgment).

## A.

At around 7:00 p.m. on May 11, 2012, Shaw was cycling down Kennesaw Mountain Drive for the first time when he struck a bulge in the road and lost control of his bicycle. No witnesses saw the resulting accident, and Shaw has no

memory of it.  Two pedestrians discovered Shaw, who was unresponsive, where he came to rest approximately 100 feet downhill from the bulge.  Shaw sustained serious injuries in the accident, including a blunt traumatic head injury with facial fractures, vertebrae fractures, and a moderately severe traumatic brain injury.

Kennesaw Mountain Drive is located within Kennesaw Mountain Park, which is a Civil War battlefield and recreational area in Cobb County, Georgia, that is owned, controlled, and operated by the United States through the National Park Service ("NPS").  The Park is open to the public and free for use.  Kennesaw Mountain Drive is a paved, two-lane, 1.5-mile-long road that provides motor, bicycle, and pedestrian access to the top of the mountain (elevation 1,808 ft.) for which the Park is named.  The road gains more than 500 feet in elevation from bottom to top.  Cyclists use the road with great frequency.

Near the bottom of Kennesaw Mountain Drive, in the middle of the downhill lane, there was, at the time of Shaw's accident, a "root heave" or "bulge" in the pavement created by subterranean tree roots exerting pressure on the asphalt of the road, causing it to rise and crack.  The root heave was 4 feet long and 3 feet wide, and, at its highest point, was 3.5 inches higher than the adjacent roadway.  Trees bordered the road on both sides, casting shadows over the root heave.  Shaw presented expert testimony that the root heave caused his accident.

3

**B.**

Kennesaw Mountain officials knew about the root heave over a year before Shaw's accident. In February 2011, a cyclist going downhill on the mountain road lost control of his bicycle and wiped out. The cyclist, according to the Park's incident report, suffered a "[p]ossible broken collarbone," among other injuries. After the accident, Park Superintendent Stanley Bond and Park Facilities Manager Tom Sparks examined the road in the area of the accident. They discovered the root heave and discussed whether it caused the accident.

Later in February 2011, another cyclist going downhill had an accident in the same general area. According to the Park's incident report, the cyclist's helmet was cracked, she seemed to have suffered memory loss, and she went to the hospital by ambulance for a CAT scan of her head.[1] The incident report also notes that an "unidentified bicyclist" came up to the park ranger at the scene of the accident and "yell[ed] about the bump in the road near the [Georgia] monument."

Thereafter, Facilities Manager Sparks determined that the root heave was unsafe, having likely caused both accidents, and needed to be repaired. Sparks contacted a contractor to obtain an estimate for removing the root heave and patching the road. To identify the spot for the contractor, Sparks used red spray

---

[1] The evidence also reflects that the cyclist suffered a broken neck, a fractured skull, intracranial hemorrhage, and a fractured collarbone, and that she spent three days in the intensive-care unit. There is no evidence that the Park was aware of these additional injuries, however.

paint to mark an "X" within a box over the root heave. He stated at his deposition that he was "pretty pushy on the contractor to get there as soon as they could," and he went to Superintendent Bond right after getting the contractor's $1,900 repair estimate. Sparks met with Bond, presented the estimate, and recommended fixing the road. Bond decided not to authorize the repair, however, and he did not direct Sparks or anyone else to warn cyclists of the root heave.

After meeting with Superintendent Bond, Facilities Manager Sparks returned to the root heave and painted the X again with the same red spray paint in order to, he says, "make it pop out to people so that they could see it." Bond testified, however, that he did not know whether the red X was intended to be a traffic control device and that he did not believe that the red X "was intended as a warning." Besides the spray-painted red X, Park officials did nothing before Shaw's accident to warn of or repair the root heave.

Despite the red X, cyclists continued to traverse the root heave. Chief Park Ranger Anthony Winegar, who was responsible for traffic-control devices at the Park in conjunction with the Facilities Manager, testified that he observed numerous cyclists traverse the marked root heave, both before and after Shaw's accident, while he conducted speed checks of cyclists and motorists coming down the mountain road. From a spot about 350 feet downhill from the root heave, Winegar could see "an undulation in [the] riding behavior" of cyclists traversing

the root heave. Nevertheless, he stated that the cyclists safely traversed the root heave. And both Winegar and Superintendent Bond testified that they did not receive any complaints from cyclists about the condition of the road.

By the time of Shaw's accident in May 2012, the red X was "very faint," according to one of the park visitors who discovered Shaw. That visitor testified that she frequently walked the mountain road with her husband and had not noticed the red X or the root heave before Shaw's accident.

After Shaw's accident, the Park placed yellow, diamond-shaped warning signs in the area stating, "Uneven Road Surface." Later in 2012, the Park removed the root heave and patched the road. Park Superintendent Nancy Walther, who took over that job in November 2011, authorized the repair. She testified that, in light of Shaw's accident, the root heave was not safe, the Park had a responsibility to warn of or remedy it after learning about it, the red X was an insufficient warning, and a cyclist would not be able to see the red X in time to avoid it.

## II.

The Shaws sued the United States (acting through the NPS) in May 2015 under the FTCA, alleging violations of Georgia state law and seeking damages for Shaw's injuries and for Jeanenne's loss of consortium. The Shaws alleged that NPS knew of the dangerous root heave and failed to guard or warn against it. The United States moved for summary judgment, arguing that it was immune from

liability under Georgia's Recreational Property Act because Shaw could not establish that his injuries resulted from a "willful or malicious failure to guard or warn against a dangerous condition." O.C.G.A. § 51-3-25.

Both parties proffered experts. Shaw's was Kelly Kennett, an expert in accident reconstruction. According to Kennett's expert report, he intended to testify that the root heave caused Shaw's accident, that Shaw was traveling between 25 and 32 miles per hour at the time he struck the root heave, and that there was no prior warning for the root heave.

The district court held a joint hearing on the United States's motion for summary judgment and its motion to exclude much of Kennett's testimony. During the hearing, the court granted in part and denied in part the motion to exclude. As relevant here, the court excluded Kennett's opinion that there was no prior warning for the root heave. Kennett, the court explained, admitted he was not a warnings expert, and "[a]ny opinion that the red marking is not a warning is also an opinion that the red marking was not sufficient to constitute a warning, even if it was intended to be a warning."

Following the hearing, the district court entered an order granting the United States summary judgment. The court found no evidence that Kennesaw Mountain Park officials knew that the root heave, even though it was dangerous, was not apparent to visitors once marked with red paint, or that Park officials chose not to

7

warn users in disregard of the possible consequences.  As to the latter issue, the court found that there was no willful failure to warn because Facilities Manager Sparks testified that he intended the red X to be a warning.  The court concluded, therefore, that the United States was immune from liability under Georgia's Recreational Property Act, that Shaw could not bring a negligence claim, and that Jeanenne's loss-of-consortium claim could not survive on its own.

The Shaws timely appealed, challenging the exclusion of portions of Kennett's expert testimony and the grant of summary judgment.  We conclude that summary judgment was inappropriate even if Kennett's opinion about the lack of a prior warning is excluded, so we need not and do not resolve whether the district court abused its discretion in excluding that opinion.

### III.

We review *de novo* the district court's grant of summary judgment, "considering the facts and drawing all reasonable inferences in the light most favorable to the non-moving party."  *Melton v. Abston*, 841 F.3d 1207, 1219 (11th Cir. 2016).  "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Id.* (quoting Fed. R. Civ. P. 56(a)).

At the summary-judgment stage, the court's function is simply to determine if there is a "genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 249 (1986).  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Id.*  In making that determination, courts may not weigh the evidence or make credibility determinations.  *Carter v. Butts Cty., Ga.*, 821 F.3d 1310, 1318 (11th Cir. 2016).

## IV.

The Shaws sued under the FTCA, which permits the United States to be sued under state law for claims arising from torts committed by federal employees acting within the scope of their employment.  *Zelaya v. United States*, 781 F.3d 1315, 1323 (11th Cir. 2015); *Motta ex rel. A.M. v. United States*, 717 F.3d 840, 843 (11th Cir. 2013); *see* 28 U.S.C. §§ 1346(b)(1), 2679(d)(1).  When so sued, the United States is liable "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674.

In this case, the United States's position is that of a property owner allowing recreational use of its land.  Georgia law generally shields such property owners from ordinary premises liability so as "to encourage owners of land to make land and water areas available to the public for recreational purposes."  O.C.G.A. § 51-3-20.  Specifically, Georgia's Recreational Property Act provides that "an owner of land owes no duty of care to keep the premises safe for entry or use by others for recreational purposes or to give any warning of a dangerous condition, use, structure, or activity on the premises to persons entering for recreational purposes."

9

*Id.* § 51-3-22. The parties agree, as do we, that the Act applies here. *See Carroll*

*v. City of Carrollton*, 633 S.E.2d 591, 593 (Ga. Ct. App. 2006) ("The RPA draws

no distinction between whether the property is owned by a private party or

governmental entity.").

There are two exceptions to immunity, one of which is relevant: property

owners are not immune from liability for injuries resulting from "willful or

malicious failure to guard or warn against a dangerous condition." O.C.G.A. § 51-

3-25.[2] No malice is alleged here; rather, the issue is whether there was a "willful

failure" to warn. The Georgia courts explain that a willful failure to warn "imports

a conscious, knowing, voluntary, intentional failure, a purpose or willingness to

make the omission, rather than a mere inadvertent, accidental, involuntary,

inattentive, inert or passive omission." *Lowry v. Cochran*, 699 S.E.2d 325, 330

(Ga. Ct. App. 2010) (quotation marks omitted); *Collins v. City of Summerville*, 643

S.E.2d 305, 308 (Ga. Ct. App. 2007). Constructive knowledge is not enough. *Ray*

*v. Ga. Dep't of Nat. Res.*, 675 S.E.2d 585, 588 (Ga. Ct. App. 2009).

A defendant is immune under the Recreational Property Act, therefore,

unless it fails to warn of a known, dangerous condition on its recreational property.

Specifically, to prevail on a claim of willful failure to warn, the plaintiff must

---

[2] The second exception to immunity applies where "the owner of land charges the person or persons who enter or go on the land for the recreational use thereof." O.C.G.A. § 51-3-25. This exception does not apply because Kennesaw Mountain Park was free for recreational use.

establish that the defendant (1) knew the property was being used for recreational purposes; (2) knew a condition existed involving an unreasonable risk of death or serious bodily harm; (3) knew the condition was not apparent to those using the property; and (4) having the foregoing knowledge, chose not to warn users of the condition, in disregard of the consequences. *Stone Mountain Mem'l Ass'n v. Amestoy*, 788 S.E.2d 110, 113 (Ga. Ct. App. 2016).

The district court concluded that the first two elements were satisfied but that Shaw had failed to produce sufficient evidence of the third and fourth elements. The parties focus on these latter two elements; the United States does not dispute that Park officials knew of a dangerous condition on property being used for recreational purposes. After careful review, we conclude that genuine issues of material fact remain in the record as to the latter two requirements, and, accordingly, that summary judgment was inappropriate. For the sake of completeness, we address each of the four elements in turn.

First, Kennesaw Mountain Park officials knew the Park was being used for recreational purposes. Specifically, they knew cyclists frequently climbed and descended Kennesaw Mountain Drive.

Second, a reasonable jury could conclude that Park officials knew a condition existed involving an unreasonable risk of death or serious bodily harm. Two prior bicycle accidents, which caused serious injury to the cyclists involved,

led Park officials to discover the root heave in or around February 2011. Facilities Manager Sparks determined that the root heave may have been to blame for these accidents, conveyed that belief to Superintendent Bond, who had also inspected the root heave, recommended repairing the road for the safety of Park visitors, and went so far as to obtain an estimate for the repair. From these facts, a reasonable jury could conclude that Park officials knew the root heave posed an unreasonable risk of death or serious bodily harm to cyclists.

Third, genuine issues of material fact remain as to whether the United States knew that the dangerous condition created by the root heave was not apparent to visitors. The district court found no evidence that the United States knew that the root heave, once marked with a red X, was not apparent to visitors.[3] We respectfully disagree. Park officials were aware of the physical features of the root heave and the surrounding environment, including the presence of trees which casted shadows on the road. And even relatively close pictures of the root heave do not clearly depict the dangers it posed—like a 3.5-inch rise in the pavement at the highest point—and instead appear to show a collection of common cracks in the pavement. *See* Doc. 47-30; Doc. 53-13. Moreover, by the time of Shaw's

---

[3] It's not clear whether we may consider the "altered condition" of the root heave—as marked with the red X—when assessing whether the dangerous condition was apparent. That the United States asserts that the red X was a warning suggests we should analyze it as part of the fourth element: whether the Park failed to warn of the condition. In any case, there is some evidence, sufficient to meet Shaw's burden, that Park officials knew that the root heave, even in its altered condition, was not apparent to visitors.

accident, the red X was "very faint," and a frequent pedestrian on the mountain road had not noticed it before the accident.  From these facts, a jury could reasonably find that the risks posed by the root heave, even when marked with a red X, would not be obvious or apparent to cyclists—such that they could act to avoid the condition—coming down the mountain road at or near the speed limit of 25 miles per hour.[4]

Other evidence likewise suggests that Park officials knew that the marked root heave was not apparent to cyclists.  Chief Ranger Winegar observed numerous cyclists traverse the marked root heave, seeing an "undulation" in their riding behavior from a distance of 300 feet, which suggests that he knew that the root heave was not apparent because cyclists took no action to avoid a dangerous condition.  And Facilities Manager Sparks was "pushy" with the contractor after marking the root heave, indicating a belief that the marking alone did not make the danger apparent.  Construing the evidence and drawing all reasonable inferences in the Shaws' favor, a reasonable jury could conclude Park officials knew that the marked root heave was not apparent to cyclists.

---

[4] The United States asserts that Shaw's expert Kennett acknowledged there is evidence that Shaw saw something in the road before the accident.  But that does not accurately reflect Kennett's testimony.  Kennett testified that Shaw was braking as he approached the root heave, but that it would be speculative to say that Shaw was braking because he saw the root heave.  Indeed, on downhills, even in the best conditions, cyclists often must brake at times to control their speed.

Finally, genuine issues of material fact remain as whether a willful failure to warn occurred.  The United States claims, and the district court found, that Park officials were at most negligent in light of Facilities Manager Sparks's testimony that he intended the red X to be a warning.  According to the United States, questions about the adequacy of warnings amount to, at most, negligence.  *See Lowry*, 699 S.E.2d at 330 ("Her assertion that the warnings were insufficient to alert her goes to the adequacy of the warnings, and amounts at most to negligent, and not wilful or malicious, behavior."); *S. Gwinnett Athletic Ass'n, Inc. v. Nash*, 469 S.E.2d 276, 278 (Ga. Ct. App. 1996) ("Even though its warning may not have been sufficient to reach all people present on the property, such insufficiency amounts at most to negligent, not wilful or malicious, behavior.").

In this case, however, the record contains evidence that Park officials consciously chose not to warn in disregard of the possible consequences.  Most notably, Superintendent Bond made a conscious, willful decision not to warn of or guard against the root heave.  When Facilities Manager Sparks presented Bond with an estimate and recommendation to repair the root heave, which Sparks had linked to the two bicycle accidents in February 2011, Bond decided not to authorize the repair and did not direct Sparks to put up any warning signs.

Although Facilities Manager Sparks testified that he intended the red X to be a warning to visitors, there is a genuine issue of material fact whether a warning

14

was actually given.  In contrast to both *Lowry* and *Nash*, this case does not involve a specific, though inadequate, warning for the risk that caused the injuries.  *See Lowry*, 699 S.E.2d at 329–30 (undisputed evidence of warnings for skydiving demonstration); *Nash*, 469 S.E.2d at 278 (undisputed evidence of warnings for unfinished bleachers).  Rather, the purported warning in this case is far more ambiguous.  In fact, the record reflects that Sparks originally painted the red X to identify the spot for the contractor, not as a warning to visitors.  And Superintendent Bond did not even consider the red X to be a warning, let alone an effective one.  Also, Chief Ranger Winegar knew that the red paint was not deterring cyclists from riding over the root heave.  From this evidence, a reasonable jury could conclude either that Park officials chose not to warn of a dangerous condition or believed that the purported warning was ineffective but failed to take any further action, in disregard of the possible consequences.  *See Stone Mountain*, 788 S.E.2d at 113.

The United States's reliance on more general safety measures at the Park, like enforcing the speed limit as to cyclists, is unavailing.  These general efforts were not specific to the risk and were in place well before anyone knew of the root heave.  As such, these efforts have little relevance to the issues before us.  The United States also asserts that Shaw was speeding at the time of accident, which "should be taken into account."  But our immediate concern is whether sufficient

15

evidence of the Park's willful failure to warn was presented. Plus, factual disputes about Shaw's speed at the time of the accident appear to exist.

For these reasons, we conclude that sufficient evidence exists from which a reasonable jury could find that NPS willfully failed to warn or guard against the dangerous condition of the root heave. Accordingly, genuine issues of material fact remain as to whether the United States is entitled to immunity under Georgia's Recreational Property Act, making summary judgment inappropriate.

## V.

Because we find that summary judgment was inappropriate, even without considering Shaw's expert Kennett's opinion that the red X was not a warning, we decline to consider whether the district court abused its discretion in excluding that opinion. We note, however, that the court's ruling did not directly address Shaw's argument that Kennett's opinion was based "on knowledge and experience of the subject matter" through his work as an accident reconstructionist. *See Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC*, 555 F.3d 1331, 1338 (11th Cir. 2009).

While Kennett was not a warnings expert "in the sense of designing warnings and that sort of thing," he explained that, "as a reconstructionist," he dealt "with roadway markings and where people should be and that sort of stuff all the time." Based on that experience, he opined that "a red X in the road is not anything I recognize as a reconstructionist that says 'don't drive here.'" We leave

16

it to the district court's discretion on remand to consider whether Kennett's experience as a reconstructionist qualifies him to opine that the red X was not a roadway marking that says "don't drive here," and whether, as the United States argues, additional reasons to exclude that opinion may exist.

## VI.

For the foregoing reasons, we **VACATE** the grant of summary judgment in favor of the United States and **REMAND** for further proceedings consistent with this opinion.