[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-11412

_____

D.C. Docket No. 7:11-cv-01115-LSC-SGC

WALTER MELTON,

                                        Plaintiff-Appellant,

versus

DAVID ABSTON,
GREG CARR, et al.,

                                        Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(November 18, 2016)

Before ROSENBAUM and JILL PRYOR, Circuit Judges, and UNGARO,*
District Judge.

PER CURIAM:

_____

    * Honorable Ursula Ungaro, United States District Judge for the Southern District of
Florida, sitting by designation.

Plaintiff, Walter Melton ("Melton"), appeals the district court's grant of summary judgment in favor of Defendants, Sheriff David Abston ("Sheriff Abston"), Deputy Debra Abston ("Deputy Abston"), Chief Deputy Greg Carr ("Chief Deputy Carr"), Deputy Tyler Booth ("Deputy Booth"), Deputy David Ellis ("Deputy Ellis"), Dr. Manly Sullivan ("Dr. Sullivan"), Nurse Tanya Ray ("Nurse Ray") and Dr. H. Leslie Fowler ("Dr. Fowler"), in Melton's action brought under 42 U.S.C. § 1983. Melton, formerly a pretrial detainee, asserts that the district judge erred in concluding that the facts, viewed in the light most favorable to Melton, failed to demonstrate that Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth and Fourteenth Amendments while he was incarcerated at Pickens County Jail. Melton also argues that there is a triable issue of fact as to whether Dr. Fowler conspired with Pickens County Jail officials in violation of 42 U.S.C. § 1983.

After review and oral argument, we affirm entry of summary judgment in favor of Dr. Fowler and Deputy Booth and reverse entry of summary judgment in favor of Nurse Ray, Dr. Sullivan, Sheriff Abston, Deputy Abston, Chief Deputy Carr, and Deputy Ellis. But, we also hold that Sheriff Abston and the deputy defendants are immune from suit in their official capacities as Alabama state officials.

2

## I.    FACTUAL BACKGROUND

Assessing the summary judgment record in the light most favorable to Melton, as non-movant, the facts are as follows:

Melton was a pretrial detainee at Pickens County Jail from approximately January 6, 2010 until July 14, 2011, a period of approximately sixteen months.

In August 2003, Melton was in an automobile accident in which he suffered multiple fractures, including a fracture of the left humeral shaft that required surgery. Dr. H. Chester Boston, the orthopedic surgeon who then operated on Melton, performed open reduction surgery on and transfixed Melton's left humeral shaft with a plate and several screws. (ECF No. 93-1 at 106-09.) On June 19, 2006, Dr. Boston re-examined Melton's left arm and found "the humeral fracture to be well healed." (*Id.* at 118.)

On February 11, 2010, over three years later, Melton fell from a wooden crate and hit his left arm on the top of a bench seat while boarding a transit van that was to take him from Pickens County Jail to court. (ECF No. 108 at 36-37.) Melton immediately experienced pain and the sensation of something "pop[ping]" in his left arm and so informed Deputy Ellis, but Deputy Ellis did not render first aid or pursue medical treatment for Melton. (*Id.*) Later that day, Melton's arm became discolored and began to swell. The middle part of Melton's upper arm "moved as if in two pieces." (ECF No. 34 at 38.)

3

Thereafter and continuing until transferred to the Alabama Department of Corrections, Melton repeatedly complained orally and in writing to jail employees that he believed his arm was broken and that the hardware in his upper arm was dislocated. Melton also claimed that he was experiencing severe pain, that the pain was intensifying, and that he was losing sensation in his left hand. (*Id.* at 37-43; ECF No. 93-1 at 4-30, 33-36, 38-39, 60-61.) He also began requesting a sling beginning on March 26, 2010 or possibly earlier. (ECF No. 93-1 at 4-5.)

Melton's written medical requests were reviewed initially by Nurse Ray. (*Id.* at 4-5, 7-12, 16, 18-21, 29-31, 33-36, 60-61.) Nurse Ray discussed Melton's complaints with Dr. Sullivan, a physician contracted to treat inmates at Pickens County Jail, from time to time. (ECF No. 93-1 at 191-202; ECF No. 93-2 ¶ 2.)

Nurse Ray first responded to Melton's complaints on April 19, 2010, after Melton complained the pain in his left arm was "bringing tears to my eyes." (ECF No. 93-1 at 10, 191.) On that date, she advised Dr. Sullivan that Melton felt that the rod and plate in his arm were dislocated and requested a prescription for pain medication. (*Id.* at 191.) On April 22, 2010, Dr. Sullivan prescribed Ibuprofen 800mg for pain and approved x-rays of Melton's left arm provided Melton prepaid for them. (*Id.* at 191; ECF No. 108 at 37.) That same day, Melton's mother, Mary Melton, visited the jail and paid $160 for the x-rays. (ECF No. 34 at 34.) During

4

her visit, Mrs. Melton observed her son's arm was "obvious[ly] . . . broken." (ECF No. 34 at 35.)

On April 26, 2010, Melton spoke with Chief Deputy Carr and demonstrated to him how his arm moved at the break in his bone, but Chief Deputy Carr did not pursue medical attention for Melton. (ECF No. 108 at 38.)

On April 28, 2010, Melton complained that his left arm and hand were frequently going numb, that he was in severe pain and that the Ibuprofen was not relieving the pain. (ECF No. 93-1 at 12.) Nurse Ray responded that Melton did not "have to take" the medicine if it was not giving him relief. (*Id.*)

On May 5, 2010, Melton's brothers, Daniel Melton Jr. and Wesley Melton, visited Pickens County Jail and spoke with Nurse Ray via telephone. (ECF No. 34 at 49-56.) Nurse Ray informed them that the jail was still "waiting on [Melton's] medical records to know what kind of x-rays to order." (ECF No. 34 at 54.) While at the jail, Melton's brothers also met with Sheriff Abston, the individual ultimately responsible for the care and custody of inmates at Pickens County Jail, and complained to him that Melton's broken left arm had gone untreated since February 2010. (*Id.* at 55-56; ECF No. 94-5.)

On May 7, 2010, Deputies McDaniel and Ellis took Melton to Pickens County Medical Center where his left arm was x-rayed. (ECF No. 93-1 at 120.) The technician showed Deputy McDaniel the x-rays and told him that Melton's

arm "had a bad break and some of the screws barely had anything to hold on to." (ECF No. 108 at 40-41.) When Deputy Ellis asked about Melton's arm, the technician told him Melton had a bad break. (*Id.*) Following the x-rays, Dr. Charles E. King, Jr. issued a radiology report with the following findings: "Plate and six screws transfix mid humeral fracture. There is a lateral angulation at the apex by approximately 40 degrees. Persistent lucency through the fracture site is noted though there is moderate callous formation. Some lucency around the screws in the more proximal aspect of the humerus and this grossly may represent some changes from motion at these sites. No other abnormality demonstrated." (ECF No. 93-1 at 120.) Despite these findings, Melton was returned to the jail and did not receive medical treatment.

On or about May 11, 2010, Melton requested immediate medical attention for "unbearable" pain. (*Id.* at 15.) Nurse Ray informed Melton that Dr. Sullivan's position was that Melton's arm was not broken, but that "the plate in [Melton's] arm had shifted." (ECF No. 108 at 41.) She also advised Melton that Dr. Sullivan would refer him to an orthopedist if Melton was willing to pay in advance for the visit and advised him to continue taking the Ibuprofen. (*Id.*)

On May 24, 2010, Nurse Ray scheduled an appointment for Melton with a local orthopedist, Dr. Fowler, for June 8, 2010 at 11:00 a.m. (ECF No. 93-1 at 195-96; ECF No. 108 at 41-42.) Nurse Ray advised Melton of the appointment and told

6

him that he would have to pay in advance for the visit and additional x-rays. (ECF No. 93-1 at 195-96; ECF No. 108 at 42.) Over the next month, Nurse Ray, Deputy Abston, Melton's family members and Melton's attorney had several conversations regarding payment, with the family and attorney insisting that the Pickens County Jail was required to provide Melton with medical treatment because he had been injured in its custody, and Nurse Ray and Deputy Abston insisting that Melton was financially responsible for his own medical treatment because the jail had no report that Melton had been injured while in custody. (ECF No. 93-1 at 195-98.)

On June 15, 2010, Melton was taken to Dr. Fowler's office for an orthopedic consultation and additional x-rays. (ECF No. 93-1 at 121.) In his report of the visit, Dr. Fowler noted that Melton "did reasonably well until February of this year when he re-injured his arm." (*Id.*) He then stated, in relevant part, that "X-rays [were] reviewed and show[ed] an obvious nonunion involving the mid shaft humerus with displaced hardware . . . Really the only option I have at this point in time would be to proceed with operative intervention with repair of the nonunion." (*Id.*)

Following the consultation, Nurse Ray contacted Dr. Fowler's office more than once to request that Dr. Fowler clarify his June 15, 2010 report by indicating whether Melton's injury preexisted his incarceration at the jail and whether Melton's need for surgery was urgent. (*Id.* at 197-98.) Dr. Fowler issued an addendum to his report on June 28, 2010, stating: "After further review of the x-

7

rays it is obvious that he has a longstanding nonunion present in his arm as well as a longstanding radial nerve palsy. Obviously at some point in time in the future this will need to be operatively addressed however there is no emergent nature to that problem." (*Id.* at 122.)

In the meantime, Melton continued to receive Ibuprofen for his pain. On June 21, 2010, Melton complained that the Ibuprofen was not relieving his pain, that he could "barely sleep, because of the pain" and that he could not move or feel his left hand. (*Id.* at 20.) On June 23, 2010, Nurse Ray informed Melton that Dr. Sullivan would prescribe Darvocet N-100 to treat his pain. (*Id.* at 21.) A few days later, Melton informed Nurse Ray that he could not take Darvocet because it made him nauseous to the point of vomiting, and he requested different medication. (*Id.* at 23, 25-26.)

On or about July 1, 2010, Nurse Ray spoke with Melton and stated that she "knew [Melton] was in pain" but felt as if she were "caught in the middle of this." (ECF No. 108 at 42.) Melton again complained that he could not tolerate Darvocet and was in "extreme pain." (ECF No. 93-1 at 27.) In response, on or about July 13, 2010, Dr. Sullivan prescribed Tramadol to treat Melton's pain. (*Id.* at 162, 199.) But on July 20, 2010, Melton complained that the Tramadol made him sick. (*Id.* at 29.) At this point, Melton's medication was switched back to Ibuprofen 800mg. (*Id.*)

8

On September 10, 2010, Melton was taken to the Pickens County Medical Center due to complaints of chest pain. (ECF No. 34 at 44.) Melton attempted to inform the emergency room physician that his arm was broken, but Deputy Booth, who transported Melton to the hospital, interrupted and stated that he had been instructed by Deputy Abston to advise the emergency room doctor not to "worry about [Melton's] arm." (*Id.*)

On September 27, 2010, Deputy Booth and Deputy Ellis accompanied Melton to visit a cardiologist, Dr. Holey. (ECF No. 122-1 at 5-6.) While at Dr. Holey's office, Melton spoke with a treating nurse who wished to perform a stress test on Melton, but could not because Melton's left arm was wrapped in a towel that he was using as a sling. (*See* ECF No. 93-1 at 33; ECF No. 122-1 at 5-6.)

On September 28, 2010, Melton again requested a sling for his arm. (ECF No. 93-1 at 33.) On October 4, 2010, Nurse Ray finally provided Melton with a sling at a charge of $10 against his commissary account. (*Id.* at 33, 202.)

On or about October 29, 2010, more than eight months after injuring his arm, Melton met with Dr. Sullivan for the first time. (ECF No. 109 at 73.) At that time, Dr. Sullivan admitted that he knew Melton's arm was broken but declined to examine Melton. (*Id.*) Dr. Sullivan also asserted that because the fracture predated his incarceration at Pickens County Jail, the jail was not financially responsible for

the injury. Dr. Sullivan told Melton if he wanted his arm surgically repaired, he would have to pay in advance for the surgery. (*Id.*)

Thereafter, and until Melton was transferred to the Alabama Department of Corrections in July 2011, Melton received no treatment other than Ibuprofen and/or Tramadol for pain and use of the sling, even though Melton repeatedly complained that these medications did not effectively relieve his pain, that the pain was intolerable, and that he was losing the use of and feeling in his left hand. (ECF No. 93-1 at 33-36, 38-39, 54, 60-61, 69, 77-85, 88-90, 166-72, 176-88.)

On or about July 14, 2011, Melton was transferred into the custody of the Alabama Department of Corrections. (ECF No. 109 at 74.) Between July 14, 2011 and August 9, 2011, Melton was examined by medical personnel at the Kilby Correctional Facility and Bullock Correctional Facility and received additional x-rays. (*Id.* at 74-77.)

On August 23, 2011, Melton was examined by an orthopedic specialist, Dr. Jeffrey T. Leary. (*Id.* at 26, 77-78.) Dr. Leary reviewed Melton's x-rays and concluded that Melton suffered from a "frank non-union of the humerus with hardware failure and obvious varus deformity." (*Id.* at 26.) Dr. Leary advised Melton that the repair of his arm would require two surgeries. The first surgery would be to remove the old hardware and locate the radial nerve in an attempt to

reverse the loss of feeling and movement. (*Id.* at 26-27, 78.) The second stage would involve resetting and grafting the bone and attaching new hardware. (*Id.*)

On September 8, 2011 and September 23, 2011, Melton underwent the two surgeries. (*Id.* at 34-38, 46-48.) By October 25, 2011, Melton was experiencing no pain, had full range of motion of his left shoulder, elbow, wrist and hand and was observed to have had a "complete return of his radial nerve as well." (*Id.* at 50, 79-80.) Accordingly, Melton has recovered from his injury at Pickens County Jail, except for complaints that his left arm and hand are smaller than the right and he has "not gained back the strength in his left arm that [he] had before injuring it on February 11, 2010." (*Id.* at 79-80.)

## II.    PROCEDURAL HISTORY

Melton's operative *pro se* complaint, which was filed on April 20, 2012, alleges that Pickens County Commissioners, Pickens County Jail officials, Dr. Sullivan and Dr. Fowler were deliberately indifferent to Melton's serious medical needs by failing to adequately treat his broken left arm and related severe pain. (ECF No 66.) The complaint also alleges that Dr. Fowler conspired with "Pickens County officials" to deny Melton medical treatment in violation of 42 U.S.C. § 1983. (*Id.* ¶ 62.)

On October 22, 2012, Magistrate Judge Haikala[1] issued a report and recommendation recommending dismissal of Melton's claims against various defendants who are not appellants in this case and that the remaining defendants file special reports in response to Melton's *pro se* complaint. (ECF No. 70.) The District Judge adopted the report and recommendation and, later, Magistrate Judge Greene ordered Sheriff Abston, Deputy Abston, Chief Deputy Carr, Deputy Booth, Deputy Ellis, Dr. Sullivan, Nurse Ray and Dr. Fowler to file special reports addressing Melton's factual allegations, including sworn statements of all persons with knowledge of the facts alleged in Melton's complaint. (ECF No. 79; ECF No. 86.) Magistrate Judge Greene stated that the reports might be later construed as motions for summary judgment pursuant to Fed. R. Civ. P. 56. (ECF No. 86.)

Defendants filed three special reports as follows: Dr. Sullivan and Dr. Fowler jointly filed one report; Sheriff Abston, Deputy Abston, Chief Deputy Carr, Deputy Ellis and Nurse Ray jointly filed their report; and Deputy Booth filed his report. In these reports, Defendants asserted affirmative defenses, including statutory immunity under Alabama law, sovereign immunity and qualified immunity, and argued that they were entitled to summary judgment because the record lacked evidence that Defendants were deliberately indifferent to Melton's

---

[1] The record reflects that the case initially was assigned to Magistrate Judge Paul W. Greene until October 5, 2012. The case was then briefly assigned to Magistrate Judge Madeline H. Haikala, before being transferred back to Magistrate Judge Greene and thereafter assigned to Magistrate Judge Staci G. Cornelius. (ECF No. 3; ECF No. 70; ECF No. 86; ECF No. 112.)

serious medical needs. (ECF No. 93; ECF. No. 94; ECF No. 118.) On March 27, 2014, Melton filed responses to the special reports of Drs. Fowler and Sullivan and Sheriff Abston, Deputy Abston, Chief Deputy Carr, Deputy Ellis and Nurse Ray supported by medical records and Melton's affidavit. (ECF No. 108; ECF No. 109.)

On September 8, 2014, Magistrate Judge Cornelius informed the parties that she would construe the special reports as motions for summary judgment and ordered Melton to respond to the special reports within twenty days. (ECF No. 121.) On September 15, 2014, Melton responded to Deputy Booth's special report. (ECF No. 122.)

On December 12, 2014, Magistrate Judge Cornelius issued her report and recommendation recommending denial of summary judgment for the Defendants. She based her recommendation on four findings. First, Melton's "displaced humeral bone, with loose hardware and radial nerve palsy" constituted a serious medical need that required surgical intervention. (ECF No. 125 at 14.) Second, a reasonable jury "easily could conclude" that the "jail administration's failure to schedule the surgery, and decision to instead treat the plaintiff with largely ineffective medications" was "so cursory as to amount to no care at all." (*Id.* at 15.) Third, the record evidence "create[d] a genuine issue of fact with respect to whether the defendants' failure to act on the plaintiff's need for surgery was

13

motivated by financial considerations," particularly the policy of Pickens County Jail that inmates pay in advance for non-emergent treatment. (*Id.* at 16.) Lastly, a reasonable jury could conclude that Dr. Fowler conspired with Nurse Ray to deny Melton treatment. (*Id.* at 18-20.)

Defendants filed objections to the report and recommendation. (ECF No. 128; ECF No. 129.) On January 16, 2015, the District Judge sustained the objections, declined to adopt the report and recommendation, and entered summary judgment in favor of Defendants because, in his view: (1) Melton's claims were based merely on a "disagreement with the course of diagnosis and treatment by his physicians," which is insufficient to prove an "Eighth Amendment deliberate indifference claim;" and (2) there was no record evidence supporting the inference that Dr. Fowler conspired with any prison official to deny Melton treatment. (ECF No. 130 at 6-7.)

Melton timely appealed the district court's ruling.

## III.    STANDARD OF REVIEW

We review a district court's grant of summary judgment *de novo*, considering the facts and drawing all reasonable inferences in the light most favorable to the non-moving party. *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(a). Genuine disputes of fact exist when the evidence is such that a reasonable jury could render a verdict for the non-movant. *Mann*, 588 F.3d at 1303. Factual issues are considered genuine when they have a real basis in the record. *Id.*

Summary judgment should be entered against a party who fails to make a showing sufficient to establish the existence of an essential element of his case, and on which he bears the burden of proof at trial. *Acevedo v. First Union Nat'l Bank*, 357 F.3d 1244, 1247 (11th Cir. 2004). Inferences based on speculation and a "mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004).

## IV.  **DISCUSSION**

The district court entered summary judgment because it concluded that no reasonable jury could find that Defendants were deliberately indifferent to Melton's serious medical needs in violation of Melton's constitutional rights. We review this conclusion *de novo*.

The district court did not reach the issue of Defendants' immunity from suit. However, because Defendants raised both qualified immunity and sovereign immunity in the district court and because application of these immunities are questions of law that we consider *de novo*, we need not remand to the district court

15

for a determination of whether Defendants are immune from suit. *Stroud v. McIntosh*, 722 F.3d 1294, 1297 (11th Cir. 2013); *West v. Tillman*, 496 F.3d 1321, 1326 (11th Cir. 2007) (per curiam); *see also generally Macklin v. Singletary*, 24 F.3d 1307, 1312-13 (11th Cir. 1994) (determining legal issue in the first instance where it was subject to *de novo* review and the record was developed).

We will address, in turn, whether a reasonable jury could find that each Defendant violated Melton's constitutional rights and, if so, whether each Defendant's conduct violated clearly established law, and then, to the extent necessary, whether Defendants are entitled to sovereign immunity under the Alabama Constitution and Eleventh Amendment of the United States Constitution.

A. 42 U.S.C. § 1983

To establish a claim under 42 U.S.C. § 1983, a plaintiff must prove: (1) a violation of a constitutional right; and (2) that the alleged violation was committed by a person acting under the color of state law or a private individual who conspired with state actors. *Holmes v. Crosby*, 418 F.3d 1256, 1258 (11th Cir. 2005) (per curiam); *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1283-84 (11th Cir. 2002).

The Eighth Amendment to the Constitution provides, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. The Eighth Amendment governs the

16

conditions under which convicted prisoners are confined and the treatment that they receive while in prison. *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 1976 (1994). The Supreme Court has interpreted the Eighth Amendment to prohibit "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S. Ct. 285, 290 (1976). As a pretrial detainee at Pickens County Jail, Melton's rights arose under the due process clause of the Fourteenth Amendment rather than the Eighth Amendment. *Mann*, 588 F.3d at 1306. Nonetheless, Melton's claims are "subject to the same scrutiny as if they had been brought as deliberate indifference claims under the Eighth Amendment." *Id.* To prevail on a claim of deliberate indifference, a plaintiff must show: (1) a serious medical need; (2) a defendant's deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury. *Id.* at 1306-07.

B. Qualified Immunity

Qualified immunity protects "government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982)). This immunity balances the need for official accountability with the need to permit officials to engage in their discretionary duties without fear of personal liability or harassing

17

litigation. *Pearson*, 555 U.S. at 231. But qualified immunity "does not offer protection 'if an official knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff].'" *Holmes v. Kucynda*, 321 F.3d 1069, 1077 (11th Cir. 2003) (quoting *Harlow*, 457 U.S. at 815 (internal quotation marks & alteration omitted)).

In order for government officials to enjoy qualified immunity, they must first establish that they were acting within the scope of their discretionary authority when the alleged wrongful acts occurred. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). Here, no one disputes that the Defendants were acting in the scope of their discretionary authority during the period in which they interacted with Melton.

Once it has been determined that an official was acting with the scope of his discretionary authority, the burden shifts to the plaintiff to establish that qualified immunity is inappropriate. *Id*. First, the plaintiff must show that the official's alleged conduct violated a constitutionally protected right. Second, the plaintiff must demonstrate that the right was clearly established at the time of the misconduct. *Pearson*, 555 U.S. at 232; *Grider v. City of Auburn*, 618 F.3d 1240, 1254 (11th Cir. 2010). A plaintiff must satisfy both prongs of the analysis to overcome a defense of qualified immunity. *Grider*, 618 F.3d at 1254. The

18

determination of these elements may be conducted in any order. *Pearson*, 555 U.S. 236.

A right is clearly established if a reasonable official would understand that his conduct violates that right. *See Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc). The touchstone of the "clearly established" inquiry is whether the official had "fair warning" and notice that his conduct violated the constitutional right in question. *Id.* at 1013, 1015; *McClish v. Nugent*, 483 F.3d 1231, 1248 (11th Cir. 2007).

In order for the law to be clearly established, "case law must ordinarily have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates a federal law." *Priester v. City of Riviera Beach*, 208 F.3d 919 (11th Cir. 2000) (citations omitted). The Court looks to the binding precedent set forth in the decisions of the Supreme Court, the Eleventh Circuit, or the highest court of the state (Georgia, here) to decide whether a right is clearly established. *Amnesty Int'l, USA v. Battle*, 559 F.3d 1170, 1184 (11th Cir. 2009). Typically, "[e]xact factual identity with a previously decided case is not required, but the unlawfulness of the conduct must be apparent from the pre-existing law." *Coffin*, 642 F.3d at 1013 (citations omitted).

19

A narrow exception to the rule requiring particularized case law exists. This exception applies in situations where the official's conduct "so obviously violates the constitution that prior case law is unnecessary." *Gilmore v. Hodges*, 738 F.3d 266, 279 (11th Cir. 2013) (quoting *Mercado v. City of Orlando,* 407 F.3d 1152, 1159 (11th Cir. 2005). A broad statement of legal principle announced in case law may be sufficient if it establishes the law "'with obvious clarity' to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Vinyard v. Wilson,* 311 F.3d 1340, 1351 (11th Cir. 2002). We likewise recognize the obvious-clarity exception where conduct is "so bad that case law is not needed to establish that the conduct cannot be lawful." *Id.* at 1350.

C. <u>Analysis</u>

i. *Serious Medical Need*

In this circuit, a serious medical need is considered "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994) (internal citation and quotation marks omitted), *overruled in part on other grounds by Hope v. Pelzer*, 536 U.S. 730 (2002). To constitute a serious medical need, "the medical need must be one that, if left unattended, poses a substantial risk of serious harm."

20

*Mann*, 588 F.3d at 1307 (internal citation and quotation marks omitted). We have recognized a variety of medical needs as serious medical needs. For instance, we have found that broken bones and bleeding cuts are serious medical needs that require attention within hours. *See Harris v. Coweta County*, 21 F.3d 388, 394 (11th Cir. 1994). Severe pain that is not promptly or adequately treated can also constitute a serious medical need depending on the circumstances. *McElligott v. Foley*, 182 F.3d 1248, 1255-59 (11th Cir. 1999); *Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990) (per curiam) (delay in treating inmate's broken foot, no matter how brief, could render defendants liable for deliberate infliction of pain).

Viewing the record in the light most favorable to Melton, there is evidence that Melton had a serious medical need for treatment after he fell, broke his left humerus, dislocated the hardware in his arm, and began to experience severe pain. (ECF No. 93-1 at 33-36, 38-39, 54, 59-61, 69-70, 77-83, 85, 88-90, 166-72, 176-85, 187-88.) First, Dr. Fowler, an orthopedist, examined Melton and determined that he required treatment for a "nonunion humerus with displaced hardware" and "radial nerve palsy." (ECF No. 93-1 at 121-22.) Significantly, Dr. Fowler's report stated that surgical intervention was the only treatment option. (*Id.*)

Second, Melton submitted sufficient evidence to support the conclusion that Melton's injury was "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *See Farrow v. West*, 320 F.3d 1235, 1243 (11th

21

Cir. 2003). More than one witness stated that it was obvious that Melton suffered from a badly broken arm. Multiple sources testified that after his fall "it appeared as if [Melton's] bone was sticking up under the skin," and two radiology reports reflected that the plate in Melton's arm had shifted and the screws had loosened. (ECF No. 108 at 21, 24, 27, 40-41; ECF No. 93-1 at 120.) When Melton's sisters visited him at the jail, they noted that his "arm moved as if it was separated and [Melton] could not move his hand" and they could see "a bone or rod sticking out at an angle at the midpoint of [Melton's] upper arm." (ECF No. 108 at 24, 27.) Melton's mother and brother noted a similar abnormality. (ECF No. 34 at 35; ECF No. 108 at 21.) And when Melton was transferred to Alabama Department of Corrections, Dr. Leary recognized an "obvious deformity of Melton's arm." (ECF No. 109 at 26.)

Third, the record contains Melton's testimony evidencing that he experienced severe pain upon falling, that the pain persisted and intensified, and that he continued to lose sensation in and use of his left hand until his surgery after being transferred to the custody of the Alabama Department of Corrections. (ECF No. 93-1 at 4-30, 33-36, 38-39, 54, 60-61, 69-70, 77-83, 85, 88-90; ECF No. 109 at 67-80.) Under our case law, a reasonable jury could find that Melton's severe pain and suffering constituted a serious medical need. *See e.g.*, *Brown*, 894 F.3d at 1538-39 (broken foot and attendant pain presented serious medical need);

22

*McElligott*, 182 F.3d at 1258 ("[A] jury in this case could find that, although Dr. Foley and Wagner provided some medication to Elmore, as Elmore continued to feel severe pain and as his condition deteriorated, Dr. Foley and Wagner, with knowledge of Elmore's condition, failed to provide care in response to his needs.").

We conclude that, viewed in the light most favorable to Melton, the evidence shows that after Melton fell and injured his left arm, he suffered from a serious medical need.

### ii. *Deliberate Indifference*

A plaintiff claiming deliberate indifference to a serious medical need must prove: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence.[2] *See, e.g.*, *McElligott*, 182 F.3d at 1255; *accord Bingham v. Thomas*, 654 F.3d 1171, 1176 (11th Cir. 2011)

---

[2] In *Townsend v. Jefferson Cty.*, 601 F.3d 1152, 1158 (11th Cir. 2010), a panel of this Court stated that under *Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996) and *Farmer v. Brennan*, 511 U.S. 825, 847 (1994), "a claim of deliberate indifference requires proof of more than gross negligence." We disagree with that conclusion for three main reasons. First, the "more than mere negligence" standard in *McElligott* is more consistent with *Farmer* than the "more than gross negligence" standard in *Townsend*. *Farmer*, 511 U.S. at 847 (holding that deliberate indifference requires subjective risk of serious harm and disregard of that risk by "failing to take reasonable measures to abate it"). Second, the phrase "more than gross negligence" is not found in either *Cottrell* or *Farmer*. Third, the panel in *Cottrell* found no deliberate indifference where the plaintiff failed to prove the "subjective intent element prescribed in *Farmer*" and, therefore, did not reach whether *Farmer* requires "more than mere negligence" or "more than gross negligence." *Cottrell*, 85 F.3d at 1491-92. Because *McElligott* is the earliest Eleventh Circuit case after *Farmer* to directly address the degree of culpability required under *Farmer*, we must follow it. *Morrison v. Amway Corp.*, 323 F.3d 920, 929 (11th Cir. 2003).

(per curiam). Summary judgment will be granted in favor of a defendant unless the plaintiff presents evidence of each of these elements. *Id.*

In our decisions, conduct deliberately indifferent to serious medical needs has included: (1) grossly inadequate care; (2) a decision to take an easier but less efficacious course of treatment; and (3) medical care that is so cursory as to amount to no treatment at all. *Bingham*, 654 F.3d at 1176. A defendant who unreasonably fails to respond or refuses to treat an inmate's need for medical care or one who delays necessary treatment without explanation or for non-medical reasons may also exhibit deliberate indifference. *See, e.g.*, *Waldrop v. Evans*, 871 F.2d 1030, 1036 (11th Cir. 1989) (affirming denial of summary judgment where prison official "took no action" and failed to "inform competent authorities . . . of a prisoner's need for . . . psychiatric care"); *Farrow*, 320 F.3d at 1247 (whether a delay in treatment is tolerable depends on the nature of the medical need and the reason for the delay); *Brown*, 894 F.2d at 1538 ("delay of less than a day in responding to plaintiff's broken foot would not by itself preclude a finding of deliberate indifference" and "an unexplained delay of hours in treating a serious injury states a prima facie case of deliberate indifference").

A defendant also cannot deny or delay necessary medical treatment to coerce pre-payment by a person in custody without running afoul of the Eighth

Amendment.[3] *Ancata*, 769 F.2d at 704 ("Delay in medical treatment cannot be justified as a means to coerce payment."); *see also Harris v. Thigpen*, 941 F.2d 1495, 1509 (11th Cir. 1991) (lack of funds does not "excuse the failure of correctional systems to maintain a certain minimum level of medical service necessary to avoid the imposition of cruel and unusual punishment"); *see also Hamm v. DeKalb Cty.*, 774 F.2d 1567, 1573-74 (11th Cir. 1985) (state cannot completely deny medical care or provide care "below some minimally adequate level" to "limit[] the cost of detention"). On the other hand, "a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment" does not support a claim of deliberate indifference. *Thigpen*, 941 F.2d at 1505.

In considering a deliberate indifference claim, "[e]ach individual Defendant must be judged separately and on the basis of what that person knows." *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008). Since a finding of deliberate indifference requires a finding of the defendant's subjective knowledge of the relevant risk, a genuine issue of material fact exists "only if the record contains

---

[3] We do not decide whether and precisely under what circumstances an inmate can be held financially responsible for medical services. What is clear is that prison officials may not condition medical treatment for a serious medical need on prepayment. *Ancata v. Prison Health Servs. Inc.,* 769 F.2d 700, 704-05 (11th Cir. 1985); *Reynolds v. Wagner*, 128 F.3d 166, 177 (3d Cir. 1997) (fee for medical services permissible where inmates "know that they will never be denied medical care because of an inability to pay").

25

evidence, albeit circumstantial, of such subjective awareness." *McElligott*, 182 F.3d at 1255 (citation and internal quotation marks omitted).

(a)    *Dr. Fowler*

Dr. Fowler is entitled to summary judgment. The record shows that on June 15, 2010, Dr. Fowler, a private orthopedic doctor not under contract with Pickens County Jail, ordered and reviewed x-rays of Melton's left arm and examined Melton. (ECF No. 93-1 at 121.) As a result of this examination, Dr. Fowler correctly diagnosed and reported Melton's injury as an "obvious nonunion involving the mid shaft humerus with displaced hardware" that required non-emergent surgery. (*Id.* at 121-22.)

The record contains no evidence that Dr. Fowler had any further contact with Melton or any responsibility for Melton's care after relaying his diagnosis to Pickens County Jail officials. Additionally, the record contains no evidence that Melton informed Dr. Fowler of his ongoing pain and lack of adequate treatment. Under these circumstances, Dr. Fowler was legally entitled to leave decisions concerning the timing and availability of Melton's surgery and treatment for Melton's pain to Pickens County Jail officials. *See Galluccio v. Holmes*, 724 F.2d 301, 305 (2d Cir. 1983) (affirming summary judgment in favor of physician on Section 1983 claim where the physician did not give "*orders and directives* for

26

inpatient care" and was therefore "not responsible for any of the possible violations of [the plaintiff's] rights" (emphasis in original)); *Reed-Bey v. Pramstaller*, 607 F. App'x 445, 449 (6th Cir. 2015), *cert. denied*, 136 S. Ct. 692 (2015) (affirming district court's decision to refuse to submit to jury issue of whether inmate was denied adequate follow-up treatment by physician because the inmate "did not allege any facts in his complaint to indicate that [the physician] was responsible for delaying or denying him treatment following his surgery").

There is also no evidence to support an inference that Dr. Fowler conspired with Nurse Ray or any other Pickens County Jail official to deny or delay treatment. To establish a prima facie case of a conspiracy under 42 U.S.C. § 1983, Melton must show evidence of an understanding or "willful participation" between Dr. Fowler and jail officials or Nurse Ray to violate Melton's civil rights and there must be more than a "mere scintilla of evidence" of a conspiracy to survive summary judgment. *Rowe*, 279 F.3d at 1283-84 (internal citations and quotation marks omitted). The "linchpin for conspiracy is agreement, which presupposes communication." *Bailey v. Bd. of Cty. Comm'rs of Alachua Cty., Fla.*, 956 F.2d 1112, 1122 (11th Cir. 1992).

The only possible basis for Melton's contention that Dr. Fowler conspired with *any* Pickens County Jail official is the June 28, 2010 addendum that apparently resulted from the June 2010 conversations between Nurse Ray and Dr.

27

Fowler's office. (ECF No. 93-1 at 122, 197-98.) However, the addendum essentially contains objectively accurate conclusions that the nonunion of the left humerus was "longstanding" and that surgery was needed but not an emergency. (*Id.* at 122.) Nor does any evidence exist to show that Dr. Fowler's medical opinion changed regarding the longstanding nature of the injury or the non-emergent need for surgical intervention.[4]

Additionally, there is no evidence that Dr. Fowler knew the Defendants would use his statements to deny or delay treatment under circumstances where the need for treatment was or became evident. *See Lowe v. Alridge*, 958 F.2d 1565, 1572-73 (11th Cir. 1992) (reversing and entering summary judgment in favor of private defendant who had no knowledge of conspiracy and "thus could not have conspired to deprive [the plaintiffs] of their rights"). Put simply, nothing in the conversations between the jail officials and Dr. Fowler's office suggests that Dr. Fowler was persuaded to change his medical opinion knowing that the jail could use his statements to deprive Melton of necessary treatment.

Because Dr. Fowler did not violate Melton's constitutional rights, we need not reach the second prong of the qualified immunity inquiry. *Hudson v. Hall*, 231 F.3d 1289, 1294 (11th Cir. 2000). Dr. Fowler is entitled to summary judgment.

---

[4] While Dr. Fowler's original report stated that Melton "re-injured" his arm in February 2010, Dr. Fowler later explained that he simply documented what Melton told him. (ECF No. 93-3 at ¶ 4.)

28

(b)    *Dr. Sullivan*

(1)    *Melton's constitutional right*

After consideration of the facts, we reverse the district court's grant of summary judgment in favor of Dr. Sullivan because a reasonable jury could find that he was deliberately indifferent to Melton's serious medical needs.

As an initial matter, a reasonable jury could find that Dr. Sullivan knew Melton's arm was broken, the hardware in Melton's arm was dislocated, and that these circumstances caused Melton severe pain. The evidence reflecting Dr. Sullivan's subjective knowledge includes Melton's testimony that he repeatedly sought medical attention for his severe pain, Melton's numerous medical requests, Nurse Ray's notes documenting her communications with Dr. Sullivan regarding Melton's condition, and Dr. Sullivan's review of the May 7, 2010 radiology report. (ECF No. 93-1 at 4-30, 33-36, 38-39, 60-61, 120, 191-203; ECF No. 109 at 73-74.) No real dispute exists as to Dr. Sullivan's knowledge of Melton's condition.

Next, a reasonable jury could also find that Dr. Sullivan acted with deliberate indifference to Melton's injury and resulting pain. Most notably, Dr. Sullivan did not even meet with Melton in person until approximately eight months

after his injury. Even then, Dr. Sullivan never examined Melton's arm despite knowing it was fractured and painful. Additionally, Dr. Sullivan failed to offer a sling or other device that might have relieved Melton's suffering, despite Melton's requests for a sling to support his arm. Instead, for months, Melton used a towel as a make-shift sling. It was not until October 2010 that Melton was finally provided a sling. (ECF No. 93-1 at 33, 202.)

Nor did Dr. Sullivan do much to address Melton's pain, even though Melton described his pain as "severe," "unbearable," "intolerable," and "bringing tears." (ECF No. 93-1 at 5-88.) Dr. Sullivan prescribed only Ibuprofen (which was ineffective), Tramadol (that made Melton sick) and Darvocet (that Melton could not tolerate). (ECF No. 93-1 at 4-30, 33-36, 38-39, 54, 60-61, 69, 77-83, 85, 88-90, 166-72, 176-85, 187-88, 191-203; ECF No. 109 at 73-74.) Even after Dr. Fowler opined that surgery was the only option for Melton, Dr. Sullivan refused to arrange for surgery unless Melton "pa[id] the necessary expenses" in advance or through a payment plan. (ECF No. 93-2 ¶ 16.) These decisions were made by Dr. Sullivan despite Melton's pleas of desperation. The extent of Melton's desperation is encompassed in one of his medical requests in which he stated, "I have been brought to the point of hopelessness, and fear for my life due to nonmedical treatment. I am being neglected to the point, where I may lose my arm." (ECF No. 93-1 at 26.)

30

A jury presented with this evidence could reasonably conclude that Dr. Sullivan's treatment of Melton was "grossly inadequate," "so cursory as to amount to no treatment at all" or an unconstitutional denial of "[m]inimally adequate care" based on impermissible financial considerations. *See Bingham*, 654 F.3d at 1176; *see also Thigpen*, 941 F.2d at 1509; *see also Ancata*, 769 F.2d at 705. And the initial three-month delay in providing Melton any treatment at all further supports a finding of deliberate indifference. *See Farrow*, 320 F.3d at 1246 ("substantial and inordinate delay in treatment" raised a jury question as to deliberate indifference towards prisoner's medical need); *Thigpen*, 21 F.3d at 289 (several weeks was too long to respond to inmate's serious medical need).

Finally, based on this evidence, a reasonable jury could find that Dr. Sullivan's deliberate indifference was the cause of Melton's constitutional injury. *See Goebert v. Lee Cty.*, 510 F.3d 1312, 1327 (11th Cir. 2007) (causation can be shown by personal participation in the constitutional violation).

### (2)    *Was Melton's right clearly established?*

Melton's constitutional right to adequate medical care in these circumstances was sufficiently "clearly established . . . that a reasonable official would understand that what he [was] doing violate[d] [Melton's] rights." *See Gilmore*, 738 F.3d at 277 (citing *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc)); *McElligott*, 182 F.3d at 1260 (noting that "qualified immunity seeks to

31

ensure that defendants 'reasonably can anticipate when their conduct may give rise to liability,' by attaching liability only if '[t]he contours of the right [violated are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" (quoting *United States v. Lanier,* 520 U.S. 259, 270 (1997)).

Principles of law set forth in other cases clearly establish that Dr. Sullivan's conduct amounted to deliberate indifference. The Supreme Court's decision in *Estelle* established that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment." *Estelle*, 429 U.S. at 104, 97 S. Ct. at 290 (internal citation omitted) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S. Ct. 2909, 2925 (1976)). And this Court has made it clear in similar circumstances that officials violate an inmate's Eighth Amendment rights by failing to provide, unreasonably delaying or providing grossly inadequate medical care that causes an inmate to "needlessly suffer" severe pain. *See, e.g., Brown*, 894 F.2d at 1538 (unexplained delay of hours in treating broken foot states *prima facie* case of deliberate indifference); *Farrow*, 320 F.3d at 1248 (reversing summary judgment entered in favor of physician where inmate "was permitted to suffer from pain, bleeding and swollen gums and periodic weight loss, and the defendants . . . offered no reasonable medical reason for the fifteen-month delay" in providing treatment).

32

Two specific cases are sufficiently similar to have put Dr. Sullivan on notice that his actions or inaction violated Melton's constitutional right to timely treatment for serious medical needs. First, in *Harris v. Coweta County*, 21 F.3d 388 (11th Cir. 1994), an inmate brought a Section 1983 action alleging that he was denied proper medical treatment for a hand injury. *Harris*, 21 F.3d at 289. Three fingers on the prisoner's left hand had become curled up and his fingernails grew toward and into the palm of his hand, resulting in the inability to open them. *Id.* After various delays, the prisoner was referred to a specialist for a nerve conduction study, which revealed that the prisoner required surgery "as soon as possible . . . ." *Id.* at 392. Based on this recommendation, the prisoner saw another doctor—a surgeon—who agreed that the prisoner needed surgery, but this time, the doctor recommended that it be done at the state medical facility. *Id.* Based on this information, the prison doctor opined that although surgery was needed, *it was not necessary immediately* and that a few weeks would not make a difference. *Id.* The doctor informed the Sheriff that the prisoner's surgery should be done as soon as practical but that it need not be done on an emergency basis. *Id.* The prisoner was later transferred to the state prison system and his surgery took place six weeks later. During the delay in treatment, the inmate was given only pain medication. *Id.* at 391, n. 2.

33

In denying the Sheriff qualified immunity, we noted that the Sheriff knew of the prisoner's serious medical condition by the end of November, though it was not an emergency situation. We discussed the fact that the tolerable length of delay in providing medical attention depends on the nature of the medical need and the reason for the delay. *Id.* at 394. For serious injuries like the inmate's, we found that the "law was clearly established several weeks was too long to fail to properly respond" to the inmate's serious medical need. *Id.* And the inmate's transfer to the state system was not an adequate explanation for the delay. We concluded: "Inaction in the face of a known serious medical need, a prescribed course of care, and the failure of an alternative course of action (the transfer to the state system), is not conduct that a sheriff could reasonably consider lawful." *Id.*

Here, it took several months for Melton to receive any treatment. And, when he finally saw an orthopedist, Dr. Fowler acknowledged that the only way to treat the nonunion of Melton's humerus, displacement of hardware, and radial nerve palsy was for Melton to "proceed with operative intervention." (ECF No. 93-1 at 121.) Despite Dr. Fowler's opinion that Melton's arm would "need to be operatively addressed," (*Id.* at 122), Dr. Sullivan did not pursue surgical intervention. Rather, Dr. Sullivan continued to treat Melton's arm with only pain medication.

34

Our decision in *McElligott* also clearly established Melton's right to timely treatment. In *McElligott*, we reversed a district court's grant of summary judgment in favor of a doctor and nurse. *McElligott*, 182 F.3d at 1257-59. In that case, a prisoner complained for months about abdominal pain and vomiting. *Id.* at 1252. After the prisoner was examined, he was placed on a liquid diet, prescribed Tylenol for pain, and given Pepto-Bismol. *Id.* Medical staff continued this treatment over the course of months, even though the prisoner continuously complained of severe pain that was unbearable. *Id.* Like Melton here, the inmate completed multiple inmate request forms begging for medication to relieve the pain. *Id.* Despite these complaints, medical staff did not perform any tests, choosing instead to wait for the inmate's records from a VA hospital. *Id.* Months later, the inmate was diagnosed with terminal cancer. *Id.* at 1254.

The district court granted summary judgment in favor of the prison medical staff, but we reversed on appeal. We noted that deliberate indifference to serious medical needs includes the "unnecessary and wanton infliction of pain." *Id.* at 1254 (citing *Estelle*, 429 U.S. at 104, 97 S. Ct. at 291). And, we found that a jury question existed as to whether the jail's medical staff was deliberately indifferent to the inmate's medical need for further diagnosis and treatment of the severe pain that he experienced. *Id.* at 1256-57. We emphasized that "prison officials with knowledge of the need for care may not, by failing to provide care, delaying care,

35

or providing grossly inadequate care, cause a prisoner to needlessly suffer the pain resulting from his or her illness." *Id.* at 1257.

While these cases do not address facts identical to those in this case, our Circuit precedent makes clear that Dr. Sullivan is not entitled to qualified immunity. *See Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005) (constitutional right may be clearly established based on a "materially similar case," the existence of a "broader, clearly established principle [that] should control the novel facts in this situation," or conduct which "so obviously violates the constitution that prior case law is unnecessary"); *McElligott*, 182 F.3d at 1260 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (official not entitled to qualified immunity where it is "apparent" that acts were unlawful under preexisting law).

Because we conclude that a reasonable jury could find that Dr. Sullivan violated Melton's clearly established constitutional rights, we reverse the district court's grant of summary judgment and remand for further proceedings.

(c)     *Nurse Ray*

(1)     *Melton's constitutional right*

We also reverse the district court's entry of summary judgment in favor of Nurse Ray. The record includes substantial evidence, consisting mainly of Melton's medical requests and Nurse Ray's own notes, that Nurse Ray had

subjective knowledge of Melton's injury and related pain, and the loss of the use and feeling in Melton's left hand. (ECF No. 93-1 at 4-30, 33-36, 38-39, 54, 60-61, 69-70, 77-83, 85, 88-90, 191-203.) Nurse Ray was the person with whom Melton spoke with most concerning his injury and resulting pain. And Nurse Ray conveyed Melton's concerns to Dr. Sullivan. Again, the fact that Nurse Ray had subjective knowledge of Melton's serious medical needs is not disputed, nor could it be. Nurse Ray herself told Melton that she "knew [Melton] was in pain" but felt as if she were "caught in the middle of this." (ECF No. 108 at 42.)

Substantial evidence in the record also exists that Nurse Ray was deliberately indifferent to Melton's suffering. *See, e.g.*, *McElligott*, 182 F.3d at 1258-59; *Brown*, 894 F.2d at 1538. Melton's medical requests, viewed in the light most favorable to Melton, suggest that Nurse Ray knew by March 26, 2010, at the latest, that Melton had displaced hardware in his left arm and that in the months afterwards Melton suffered continuous and severe pain and began losing sensation in his left arm. (ECF No. 93-1 at 4-5, 33-36, 38-39, 54, 60-61, 69-70, 77-83, 85, 88-90, 191-203.)

Despite her knowledge of Melton's condition and his complaints, Nurse Ray failed to: (1) take any action to address Melton's injury until April 19, 2010; and (2) provide Melton with a sling until October 2010, nearly eight months after Melton's injury. (ECF No. 93-1 at 33, 191, 202.) Nurse Ray denied Melton a sling

37

even though he began requesting it in March 2010 and despite the fact that she advised Dr. Sullivan that Melton felt that the rod and plate in his arm were dislocated. (*Id.*) Even with respect to the provision of x-rays, Nurse Ray advised Melton that he would be required to the cover the expense associated with the procedure. (*Id.*) Then she dickered with Melton's family over payment for several weeks before making the appointment with Dr. Fowler. (ECF No. 93-1 at 191-95.) A reasonable jury could conclude based on these facts that Nurse Ray knowingly and deliberately inflicted pain on Melton by failing to render any treatment for more than two months after his injury and deliberately delayed rendering treatment thereafter for non-medical reasons. A reasonable jury could also find that Nurse Ray's deliberate indifference was the cause of Melton's constitutional injury. *See Goebert*, 510 F.3d at 1327 (causation can be shown by personal participation in the constitutional violation).

### (2)    *Was Melton's right clearly established?*

As we have noted, this Court has repeatedly held that an unreasonable delay in treating a serious medical need, such as Melton's nonunion, dislocated hardware and ongoing severe pain, constitutes deliberate indifference. *See e.g., Farrow*, 320 F.3d at 1248. In *Harris* we affirmed the denial of qualified immunity based on a several week delay in treating swollen and malodorous hand. *Harris*, 21 F.3d at 394. And, in *Brown*, we concluded that "a deliberate delay on the order of hours in

38

providing care for a serious and painful broken foot is sufficient to state a constitutional claim." *Brown*, 894 F.2d at 1538. These cases clearly established that a three-month delay in providing any treatment at all and an eight-month delay in providing a sling for a bone disunion constitutes deliberate indifference.

Any argument by Defendants that the delay in treatment was caused by Melton's failure to pay for his own medical treatment is meritless. Our circuit has clearly established that a deliberate delay in rendering necessary medical treatment for non-medical reasons is enough to state a deliberate indifference claim. *Farrow*, 320 F.3d at 1246 (internal citations omitted); *Thomas v. Town of Davie*, 847 F.2d 771, 772-73 (11th Cir. 1988); *Ancata*, 769 F.2d at 704 ("Furthermore, if necessary medical treatment has been delayed for non-medical reasons, a case of deliberate indifference has been made out.").

Because the "contours of unreasonable delay in providing treatment for serious medical needs were defined with enough particularity to allow [Nurse Ray] . . . to understand whether [her] actions were lawful," Nurse Ray is not entitled to qualified immunity. *Harris*, 21 F.3d at 394. We therefore reverse the district court's grant of summary judgment and remand the case for further proceedings with respect to Nurse Ray.

    (d)   *Sheriff Abston*

        (1)   *Melton's constitutional right*

Likewise, we reverse the grant of summary judgment in favor of Sheriff Abston. First, ample evidence exists that Sheriff Abston had subjective knowledge that Melton injured his left arm and thereafter suffered severe pain. The evidence reflecting Sheriff Abston's subjective knowledge includes affidavits from Melton and his brothers, Daniel Melton Jr. and Wesley Melton. While visiting the jail in May 2010, Melton's brothers met with Sheriff Abston and complained to him that Melton's arm had gone untreated since February 2010. (ECF No. 34 at 55-56; ECF No. 94-5.) During the conversation, Melton's brothers advised Sheriff Abston that their brother had been complaining since February 2010 about his injury and the lack of medical attention that he received. (ECF No. 34 at 55, ECF No. 108 at 31-34.) The various inmate request forms submitted by Melton to the Sheriff's office also support a finding that Sheriff Abston knew about Melton's injury and resulting pain. Finally, Sheriff Abston's own affidavit stating that he "instructed [his] staff to provide all necessary medical care to Mr. Melton" evidences his knowledge of Melton's serious medical need. (ECF No. 34 at 37-45, 49-56, 77-78; ECF No. 94-5 at 2.)

There is also evidence to permit a reasonable jury to find that Sheriff Abston knowingly and intentionally disregarded Melton's serious medical needs. Despite knowing of Melton's injured left arm, severe pain and loss of feeling in his left hand and being ultimately "responsible for the care and custody of inmates in the

40

Pickens County Jail," Sheriff Abston failed to authorize x-rays of Melton's arm unless Melton paid the costs associated with the x-rays. Likewise, Sheriff Abston did not permit Melton to consult with an orthopedic physician or even allow the jail to provide a sling for Melton unless he or his family paid in advance for this treatment. (ECF No. 34 at 55-56; *see* ECF No. 93-1 at 33, 191-92, 195-96; ECF No. 94-5 at 2; ECF No. 108 at 37-38.) A reasonable jury could conclude on these facts that Sheriff Abston knowingly and deliberately inflicted pain on Melton by not only denying necessary medical treatment to coerce payment from Melton but also deliberately delaying needed treatment for non-medical reasons.

Finally, a reasonable jury could find that Sheriff Abston's deliberate indifference caused Melton's injury. *See Goebert*, 510 F.3d at 1327.

### (2)    *Was Melton's right clearly established?*

As is clear by now, an official cannot: (1) unreasonably delay necessary medical treatment as a means to coerce payment from an inmate; or (2) fail to provide a "certain minimum level of medical service necessary to avoid the imposition of cruel and unusual punishment" under the Eighth and Fourteenth Amendments. *Ancata*, 769 F.2d at 704; *Thigpen*, 941 F.2d at 1509. "Deliberate indifference to serious medical needs may be shown by failure to provide prompt attention to those needs by delaying necessary medical treatment for nonmedical reasons or by 'proving a policy of deficiencies in staffing or procedures such that

41

the [pretrial detainee] is effectively denied access to adequate medical care.'" *Town of Davie*, 847 F.2d at 772-73 (internal citations omitted)); *see also Hamm*, 774 F.2d at 1573-74.

Here, Sheriff Abston's failure to provide Melton with prompt medical treatment unless and until he paid for his own treatment constitutes a violation of a clearly established constitutional right. "The law was also clearly established that the right to medical care may include diagnostic tests known to be necessary, not just medicinal and surgical care." *Harris*, 941 F.2d at 394. Because there is substantial evidence that Sheriff Abston, at the very least, refused to authorize a radiology report of Melton's injured left arm and a sling to relieve Melton's pain unless he paid for such services in advance, Sheriff Abston is not entitled to qualified immunity.

Since a reasonable jury could find that Sheriff Abston violated Melton's clearly established constitutional rights, we reverse the district court's grant of summary judgment and remand for further proceedings.

(e) *Deputy Ellis*

(1) *Melton's constitutional right*

As with Dr. Sullivan, Nurse Ray, and Sheriff Abston, we reverse the grant of summary judgment in favor of Deputy Ellis. A reasonable jury could conclude that Deputy Ellis had subjective knowledge that Melton fell and injured his left arm,

42

thereby needing medical treatment, based on Melton's unrefuted affidavit testimony that: (1) on February 11, 2010, Deputy Ellis observed Melton fall and "hit[] [his] upper arm on the van's bench seat;" and (2) Melton immediately informed Deputy Ellis of a "pop[ping]" sensation and pain in his left arm. (ECF No. 34 at 38; ECF No. 108 at 36-37.) At the time of his injury, Melton told Deputy Ellis that he was "in a great deal of pain." (ECF No. 66 at 3; ECF No. 34 at 38.) The record further establishes that Deputy Ellis transported Melton to the hospital for x-rays on May 5, 2010. According to Melton, the x-ray technician told Deputy Ellis that Melton was suffering from a "bad break" and that the hardware in his arm was "barely holding on." (ECF No. 109 at 70; ECF No. 34 at 41-42.)

There is also unrefuted record evidence that after Melton informed Deputy Ellis of his painful injury, Deputy Ellis ignored Melton's complaints of pain. Despite knowing of Melton's injury, Deputy Ellis failed to render first aid, report Melton's injury to medical staff, Sheriff Abston or Deputy Ellis' supervisors or co-workers, or transport Melton to a medical facility. (ECF No. 34 at 38; ECF No. 108 at 36-37.) And when the x-ray technician later informed Deputy Ellis that Melton had a bad break, Deputy Ellis took no further action to obtain treatment for Melton's arm. Under these facts, a reasonable jury could conclude that Deputy Ellis was deliberately indifferent to Melton's serious medical needs because he failed to treat Melton's injury or report the injury to medical staff or his superiors.

43

*See, e.g.*, *Brown*, 894 F.2d at 1538 (denying or delaying medical treatment is tantamount to "unnecessary and wanton infliction of pain").

(2)    *Was Melton's right clearly established?*

As already discussed, Melton's constitutional right to adequate medical care was "clearly established such that a reasonable official would understand" the need to either render first aid to treat Melton's injured left arm or pursue treatment for Melton by reporting his injury to medical staff or supervisors at Pickens County Jail. *See, e.g.*, *Brown*, 894 F.2d at 1538; *Waldrop*, 871 F.2d at 1036 ("The law was clear in 1984 that prison officials have an obligation to take action or to inform competent authorities once the officials have knowledge of a prisoner's need for medical or psychiatric care." (citing *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976)).

Because a reasonable jury could find that Deputy Ellis took no action whatsoever in response to Melton's complaint of a "pop[ping]" sensation and pain in his left arm, Deputy Ellis is not entitled to qualified immunity. Deputy Ellis's lack of action following his conversation with the x-ray technician also supports the denial of qualified immunity. For these reasons, we reverse the District Court's grant of summary judgment in favor of Deputy Ellis and remand for further proceedings.

44

(f)    *Deputy Abston*

Melton's claim of deliberate indifference against Deputy Abston presents a closer question, but, ultimately we find that a reasonable jury could find from the evidence that she was deliberately indifferent to Melton's serious medical needs. We further find that she is not entitled to qualified immunity at this stage, either. We therefore reverse entry of summary judgment in favor of Deputy Abston.

First, it is undisputed that Deputy Abston knew about Melton's injury. The record reveals that one of the officers who transported Melton for x-rays of his arm told Deputy Abston upon their return to the jail that Melton had a bad break in his arm. Second, the record reflects that Deputy Abston informed Melton's family members and Melton's attorney in June 2010 that Melton would be financially responsible for his own medical treatment. Third, when Melton attempted to inform an emergency room physician at Pickens County Medical Center in September 2010 that his arm was broken and needed treatment, Deputy Booth interrupted the examination and told the doctor that Deputy Abston had instructed him to advise the doctor not to "worry about [Melton's] arm." (ECF No. 34 at 44; ECF No. 93-1 at 197; ECF No. 108 at 42-43.)

While Deputy Abston was certainly aware of Melton's serious medical needs, whether any deliberate indifference on her part caused Melton to suffer a constitutional injury is a closer call. We recognize that, by the time Deputy Abston

45

became aware of Melton's condition, Sheriff Abston, Nurse Ray and Dr. Sullivan each knew that Melton needed treatment for his injured left arm. But, we find Deputy Abston's insistence that Melton would have to pay in advance to be treated for the injury and her September 2010 instruction to Deputy Booth that medical personnel should ignore Melton's arm to be sufficient for the claim of deliberate indifference to proceed. These actions arguably resulted in further delay in treatment of Melton's arm, causing him additional pain and suffering. And it is clearly established that a delay in treatment which results in additional pain and suffering constitutes deliberate indifference.

For these reasons, we reverse the District Court's grant of summary judgment in favor of Deputy Abston.

### (g)    *Chief Deputy Carr*

We also reverse the entry of summary judgment in favor of Chief Deputy Carr. As with the other Defendants, Chief Deputy Carr's knowledge of Melton's serious medical condition appears to be undisputed. The record reflects that Melton submitted inmate complaints to Chief Deputy Carr contemporaneously with complaints submitted to Nurse Ray and Sheriff Abston. (ECF No. 108 at 37.) In the medical complaints, Melton complained of severe pain in his arm. (ECF No. 93-1 at 5-88.) Melton also spoke with Chief Deputy Carr in person on April 26,

46

2010, and demonstrated to him how his arm moved at the break in his bone. (ECF No. 34 at 40; ECF No. 108 at 37-39.)

Despite this knowledge, Chief Deputy Carr did not pursue medical treatment for Melton. (ECF No. 108 at 38-39.) While at the time of Melton's complaints and the April 26, 2010 demonstration Sheriff Abston, Nurse Ray, and Dr. Sullivan were already aware of Melton's need for medical treatment, a reasonable jury could find that Chief Deputy Carr, as a high-level prison official, could have followed up with them about Melton's ongoing condition. Chief Deputy Carr's complete lack of action arguably caused Melton's delay in treatment and additional pain and suffering, in which case he would not be protected by qualified immunity. We therefore reverse the grant of summary judgment and leave it to a jury to decide if Chief Deputy Carr's actions contributed to Melton's constitutional injury *Mann*, 588 F.3d at 1306-07; *Goebert*, 510 F.3d at 1327.

(h)    *Deputy Booth*

Finally, we affirm the District Court's grant of summary judgment in favor of Deputy Booth. While the facts establish that Deputy Booth had subjective knowledge of Melton's injury, Deputy Booth did not become aware of the injury until September 10, 2010. By this time, Melton had already been denied treatment and left to suffer in pain.

47

The record establishes Deputy Booth's knowledge based on Deputy Booth's accompaniment of Melton when he saw physicians on two occasions. First, Deputy Booth transported Melton to the hospital on September 10, 2010, when Melton complained of chest pains. (ECF No. 93-1 at 124.) Deputy Booth allegedly interrupted Melton when he attempted to inform an emergency room physician that his arm was broken. But, as we already mentioned, Deputy Abston instructed him to tell the physician "don't worry about the arm." (ECF No. 66 at 10; ECF No. 34 at 8.) Second, Deputy Booth accompanied Melton when he visited a cardiologist on September 27, 2010. At that time, the treating nurse informed Melton that she could not perform a necessary treadmill stress test because Melton's arm was wrapped in a towel that he used as a sling. (ECF No. 34 at 44; ECF No. 108 at 43; ECF No. 122-1 at 5-6.) These events gave Deputy Booth subjective knowledge of Melton's serious medical need.

Nevertheless, insufficient evidence against Deputy Booth exists to satisfy the causation prong needed to prove a claim of deliberate indifference. For this reason, Deputy Carr is entitled to summary judgment with respect to Melton's claim of deliberate indifference. (ECF No. 34 at 38-40, 44; ECF No. 108 at 36-39, 41-43); *Mann*, 588 F.3d at 1306-08; *Goebert*, 510 F.3d at 1327.

        iii.    *Sovereign Immunity*

We now address whether sovereign immunity bars Melton's claims against Sheriff Abston, the Defendant deputies, and Nurse Ray.[5] Although these Defendants did not raise the issue of sovereign immunity on appeal, they did raise the issue at the district-court level. We determine this legal issue *de novo* in the first instance because the record is fully developed. *See Macklin*, 24 F.3d at 1312-13. The Eleventh Amendment provides sovereign immunity to the states to protect them from suit in federal court without their consent. *Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003). Sovereign immunity has also been extended to state officials, acting in their official capacity, where an agency or individual may "be treated as an arm of the State partaking of the Eleventh Amendment Immunity." *Mt. Healthy City Sch. Dist. Bd. Of Educ. v. Doyle*, 429 U.S. 274, 280 (1977).

A state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity or Congress has abrogated the state's immunity. *See Lancaster v. Monroe Cty.*, 116 F.3d 1419, 1429 (1997) *abrogated on other grounds by Lake v. Skelton*, __ F.3d __, 2016 WL 6518522 (11th Cir. November 3, 2016). Congress has not abrogated Alabama's immunity and Alabama has not waived its Eleventh Amendment immunity. *See Carr v. City of*

---

[5] Drs. Fowler and Sullivan did not raise the defense of sovereign immunity in the district court and have, therefore, waived their right to assert this immunity. (ECF No. 93); *Walker v. Jones*, 10 F.3d 1569, 1572 (11th Cir. 1994).

49

*Florence,* 916 F.2d 1521, 1525 (11th Cir. 1990) (citations omitted). Consequently, Alabama state officials are immune from claims brought against them in their official capacities. *Lancaster*, 116 F.3d at 1429.

To determine whether a state official is protected by Eleventh Amendment immunity, we consider the laws of the state in question. *Id.* (citing *Carr*, 916 F.2d at 1525). The Alabama Constitution provides that a sheriff is a member of the executive branch. Art. V, § 112, Ala. Const. 1901. Thus, as an executive officer, "a sheriff is immune from being sued in the execution of the duties of his office under Art. I, § 14, Alabama Const. 1901." *Ex Parte Haralson*, 853 So. 2d 928, 932 (Ala. 2003).

It is well established in this Circuit that Alabama sheriffs and their deputies are state officials and are absolutely immune from suit as an officer of the state under the Eleventh Amendment. *See Turquitt v. Jefferson Cty.*, 137 F.3d 1285, 1288-89 (11th Cir. 1998); *Lancaster*, 116 F.3d at 1429; *see also LaFrere v. Quezada*, 582 F.3d 1260, 1263 (11th Cir. 2009) (noting that Eleventh Amendment protection extends to deputies because they are the alter ego of the sheriff). Consequently, we conclude that Sheriff Abston and the deputy defendants are immune from suit under the Eleventh Amendment for Melton's claims brought against them in their official capacity as state officials.

We decline, however, to extend sovereign immunity to Nurse Ray with respect to the claims brought against her in her official capacity. Unlike the other defendants, Nurse Ray is not a sheriff or a deputy. Rather, Nurse Ray is a nurse at Pickens County Jail and was responsible for carrying out "limited objectives and defined duties," including "verifying the various medications prescribed for inmates . . . checking does, reviewing inmate medical complaints, responding to minor medical calls, and referring more serious medical calls to a physician." (ECF No. 94-7.) Unlike Sheriff Abston and the defendant deputies, Nurse Ray's actions taken in the scope of her employment do not inherently constitute actions against the state.

The Alabama Supreme Court has previously declined to extend sovereign immunity to a jailor, noting that a jailor is not a proper extension of the Sheriff's position because a jailor cannot undertake every act that the sheriff could perform. *See Ex Parte Shelley*, 53 So. 3d 887, 895 (Ala. 2009). The Alabama Supreme Court has likewise noted that none of its decisions have extended the state immunity afforded a sheriff to any sheriff's employees other than a deputy sheriff. *Id.* at 897. We therefore find that Nurse Ray, as an employee of a county jail, does not qualify as an extension of the sheriff for purposes of sovereign immunity.

Finally, we note that Alabama officials who have sovereign immunity when sued in their official capacities are not entitled to sovereign immunity when they

are sued in their <u>individual</u> capacities under Section 1983. *Howlett By & Through Howlett v. Rose*, 496 U.S. 356, 376, 110 S. Ct. 2430, 2443 (1990). As the Supreme Court has held, "state officials, sued in their individual capacities, are 'persons' within the meaning of § 1983. The Eleventh Amendment does not bar such suits, nor are state officers absolutely immune from personal liability under § 1983 solely by virtue of the 'official' nature of their acts." *Hafer v. Melo*, 502 U.S. 21, 31, 112 S. Ct. 358, 365 (1991). Based on this clear precedent, we conclude that Sheriff Abston, the deputy defendants, and Nurse Ray are not entitled to sovereign immunity with respect to the claims brought against them in their individual capacities.

## V.    CONCLUSION

We affirm entry of summary judgment in favor of Dr. Fowler and Deputy Booth and reverse entry of summary judgment in favor of Nurse Ray, Dr. Sullivan, Sheriff Abston, Deputy Abston, Chief Deputy Carr, and Deputy Ellis. But, we conclude that Sheriff Abston and the deputy defendants are immune from suit in their official capacities as Alabama state officials.

**AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART AND REMANDED.**