[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-10391
Non-Argument Calendar
_____

D.C. Docket No. 3:15-cv-00491-MCR-CJK


RODERICK BILLUPS,

Plaintiff-Appellant,

versus

EMERALD COAST UTILITIES AUTHORITY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(October 26, 2017)

Before HULL, WILSON, and ROSENBAUM, Circuit Judges.

PER CURIAM:

Roderick Billups appeals from the district court's grant of summary judgment in favor of Emerald Coast Utilities Authority ("Emerald Coast") in his lawsuit alleging that Emerald Coast failed to provide reasonable accommodations for his disability, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and retaliated against him for seeking worker's compensation benefits, in violation of the Florida Workers Compensation Law, Fla. Stat. § 440.205.  After careful review, we affirm.

## I.

We review the district court's grant of summary judgment *de novo*, "considering the facts and drawing all reasonable inferences in the light most favorable to the non-moving party."  *Melton v. Abston*, 841 F.3d 1207, 1219 (11th Cir. 2016).  "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Id.* (quoting Fed. R. Civ. P. 56(a)).

## II.

The relevant facts, in the light most favorable to Billups, are as follows. Emerald Coast is a local governmental body that provides water, wastewater (sewer), and sanitation collection services in and around Escambia County, Florida's westernmost county.  Billups began working for Emerald Coast in September 1995.

2

At all times relevant to this lawsuit, Billups held the position of Utility Service Technician II ("UST-2") in Emerald Coast's Regional Services Department (the "Department"). The Department is responsible for the maintenance of all water and sewer infrastructure, including waterlines, sewer lines, manholes, valves, and water hydrants. As a UST-2, Billups primarily repaired water and sewer lines and the valves and equipment on those lines.

The UST-2 position was physically demanding. Billups routinely lifted moderate to heavy weight and used heavy tools like jackhammers. He also manipulated valves, which required significant exertion.

On December 18, 2013, Billups felt something pop in his right shoulder while attempting to open an old air-release valve. Later that day, an examining physician diagnosed a probable right shoulder strain and ordered an MRI. The physician stated that Billups could not lift, push, or pull more than fifteen pounds. At a follow-up visit on January 2, 2014, the physician prescribed physical therapy and advised Billups to avoid lifting more than five pounds with his right arm. With these limitations, Billups could not perform the essential functions of the UST-2 position.

Billups began leave under the Family and Medical Leave Act ("FMLA") on December 19, 2013. He expected to be able to return to work in about a month.

3

By late January 2014, however, his physician had determined that conservative treatment was unsuccessful and referred Billups to an orthopedic surgeon.

On February 11, 2014, Billups saw the orthopedic surgeon, who scheduled him for surgery to repair a bicep tear around a week later. The surgery had to be rescheduled, however, because of issues with obtaining approval from Emerald Coast's third-party administrator for workers' compensation benefits. Once Billups received approval, the surgery was rescheduled for March 14, 2014, but it had to be called off when Billups had an adverse reaction to anesthesia. Billups's shoulder surgery eventually took place on April 16, 2014.

In the meantime, Billups's twelve weeks of FMLA leave expired on March 12, 2014, about a month before the surgery. On March 26, 2014, Billups's supervisor emailed the Director of the Department, Ernest Dawson, about hiring a temporary employee to fill in for Billups until his return. Dawson responded,

> I don't mind your getting a temporary, but I want Human Resources to give me a status on this guy. I need to know about his FMLA status. I don't plan to keep him. I will let him go. His record in the past is not good. This is his last chance with [Emerald Coast].

Thereafter, Dawson spoke with Human Resources, which reminded him that, as a matter of Emerald Coast policy, Billups was entitled to receive twenty-six weeks

4

of leave instead of twelve because he had been injured on the job.[1]  No action was taken at that time.

After Billups's surgery in April 2014, the surgeon informed him that it would likely take six months to recover and return to work without restriction.  On April 29, 2014, the surgeon signed a worker's compensation form stating that Billups could not perform job-related activities even at a sedentary level.

The next day, April 30, Escambia County experienced a massive storm that dropped around twenty inches of rain and caused severe flooding.  According to Dawson, the flooding caused extensive damage to Emerald Coast's water and sewer infrastructure, from which the Department was still recovering in December 2014.  This placed considerable demands upon personnel tasked with repairing and maintaining those facilities.

---

[1] In particular, Emerald Coast's policies provided, in relevant part,

> Employees will return to work any time they are medically able, up to six (6) months from the date of injury.  At that point, if unable to return to work the employee must retire, resign, or be terminated.  The department head, after consultation with the Human Resources Director, may extend this time based on evaluation of the employee's ability to work.

> After one (1) year from the date of the injury, if the employee is continuing to have intermittent disability from the injury, the department head and Human Resources Director would review the case to determine if there is cause for extension of time.  If there is none, the employee must retire, resign, or be terminated.

On May 27, 2014, the surgeon signed a worker's compensation form identifying Billups's post-surgery restrictions as "sedentary only" and stating that he was likely to return with no restrictions in six weeks.

In early June 2014, Emerald Coast sent Billups notice that he would likely be terminated due to his continuing inability to perform the essential functions of his job with or without a reasonable accommodation. The letter stated that, as of June 18, 2014, it would be six months since the date of his injury, and it informed him of the policy that employees who suffer an on-the-job injury generally must return to work within six months or retire, resign, or be terminated. The letter stated that Billups could attend a "predetermination" hearing on June 19, 2014.

Billups appeared at the hearing on June 19 before Dawson and Cindy Sutherland, the Human Resources Director. Billups summarized the history of his injury and stressed that the surgery had been delayed through no fault of his own. He also presented some medical records, including the surgeon's report from May 27, 2014, which reflected that he could be cleared for duty by July 15, 2014. Even on that date, however, Billups indicated that he would have to do most work with his arms close to his body. Sutherland noted that Billups's next appointment was on July 8, 2014, but that Emerald Coast had no information showing that he could return to work full duty "today," the date of the hearing. Sutherland also stressed that Emerald Coast needed a release slip from his doctor before he could return to

6

work.  Billups was given until the end of the following day to obtain a more definitive statement of a return date from his physician or physical therapist.

Also at the hearing, Sutherland and Dawson asked Billups about his prior on-the-job injuries.  Dawson noted that Billups had suffered more on-the-job injuries than most employees.  Before the events giving rise to this case, Billups had experienced four on-the-job injuries:  a thumb sprain, a left-bicep strain, an eye injury, and a left shoulder injury.  After a series of questions about the injuries, Dawson summarized that most of the injuries were to the left part of Billups's body, while the recent injury was to his right.  When Billups agreed, Dawson responded, "Okay.  That answered my question."

The next day, June 20, Billups produced a letter from his physical therapist stating that Billups "continue[d] to progress through strengthening exercises" and that he could return to work as a UST-2 without restrictions when he completed his physical therapy.  The letter noted, however, that only Billups's physician could clear him to return to work.  At that time, Billups was not projected to be discharged from physical therapy until July 21, 2014.

On June 23, 2014, a Monday, Billups received notice that his employment had been terminated.  The letter explained that Billups's "continuing inability to perform the essential requirements of [his] job, with or without accommodation,

[created] a substantial hardship and impair[ed] [Emerald Coast's] ability to properly fulfill its public mission."

Billups continued to attend physical therapy sessions after his termination. On July 22, 2014, his physician limited him to lifting no more than twenty pounds overhead and advised him to complete all work with his arms close to his body. He was discharged from physical therapy on August 13, 2014, but he was not cleared to return to work without restrictions until October 23, 2014. Billups received worker's compensation benefits until October 23.

## III.

Billups filed a complaint in state court against Emerald Coast, which removed the action to federal district court. In his complaint, Billups brought two claims. First, he alleged that Emerald Coast violated the ADA by failing to provide a reasonable accommodation for his disability. Second, he alleged that Emerald Coast violated the Florida Workers Compensation Law, Fla. Stat. § 440.205, by retaliating against him for seeking worker's compensation benefits.

After discovery, the district court granted summary judgment to Emerald Coast. The court concluded, in relevant part, that Billups had not identified a reasonable accommodation that would have allowed him to perform the essential functions of his position, and that no reasonable jury could conclude that Billups

8

was retaliated against for obtaining worker's compensation benefits.  Billups now appeals.

## IV.

The ADA prohibits employers from discriminating against "qualified individual[s] on the basis of disability."  42 U.S.C. § 12112(a).  A "qualified individual" is a person who, with or without reasonable accommodations, is able to perform the essential functions of the job she holds or desires.  42 U.S.C. § 12111(8).  To establish a *prima facie* case of employment discrimination under the ADA, a plaintiff must show that he had a disability, that he was a "qualified individual," and that he was subjected to unlawful discrimination because of his disability.  *Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.2d 1264, 1268 (11th Cir. 2014).

"An employer unlawfully discriminates against a qualified individual with a disability when the employer fails to provide 'reasonable accommodations' for the disability—unless doing so would impose undue hardship on the employer." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001).  An accommodation is "reasonable" only if it allows the employee to perform the job's essential functions.  *Id.*  The employee bears the burden of identifying an accommodation that would allow him to perform the essential functions of his job. *Id.*; *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000).

On appeal, Billups contends that Emerald Coast should have accommodated his disability by offering a limited period of unpaid leave while he recovered from surgery.[2] The district court did not directly address this argument. Regardless, we affirm the district court's grant of summary judgment because Billups has not shown his requested accommodation would have allowed him to return to work "in the present or in the immediate future." *Wood v. Green*, 323 F.3d 1309, 1314 (11th Cir. 2003); *see Lucas*, 257 F.3d at 1256 (stating that we may affirm the district court's judgment on any grounds supported by the record).

This Circuit has recognized that a "leave of absence might be a reasonable accommodation in some cases." *Wood*, 323 F.3d at 1314. We first addressed this issue in *Duckett v. Dunlop Tire Corp.*, 120 F.3d 1222 (11th Cir. 1997), where we held that an employer was not required to allow an employee to stay on medical leave under a salary continuation program. *See id.* at 1225–26. Relying on the Fourth Circuit's decision in *Myers v. Hose*, 50 F.3d 278, 282 (4th Cir. 1995), we

---

[2] Before the district court, Billups also argued that he should have been given light-duty work or reassigned to another position as a reasonable accommodation. But he has abandoned these issues on appeal by failing to address them in his initial brief. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680–81 (11th Cir. 2014) (issues not raised on appeal are abandoned). In any case, we would affirm the district court even if these issues had been properly raised. In providing reasonable accommodations under the ADA, employers are not required to change the essential functions of a position or to reassign an employee when no positions are available. *See Frazier-White v. Gee*, 818 F.3d 1249, 1256 (11th Cir. 2016) ("Defendant was not required by the ADA to create a permanent light-duty position especially for Plaintiff."); *Willis v. Conopco, Inc.*, 108 F.3d 282, 284 (11th Cir. 1997) (stating that reassignment is only a reasonable accommodation if a position for which the plaintiff is qualified was available). Emerald Coast presented uncontradicted evidence that there were no open and available light-duty positions at the relevant time.

10

explained that an employer does not violate the ADA "by refusing to grant an employee a period of time in which to cure his disabilities where the employee sets no temporal limit on the advocated grace period, urging only that he deserves sufficient time to ameliorate his conditions."  120 F.3d at 1225–26 (brackets and internal quotation marks omitted).  We quoted with approval the following reasoning of the *Myers* court regarding leave as a reasonable accommodation:

> Significantly, these provisions [42 U.S.C. § 12111(8); 45 C.F.R. § 1232.3(i)] contain no reference to a person's *future* ability to perform the essential functions of his position.  To the contrary, they are formulated entirely in the present tense, framing the precise issue as to whether an individual "can" (not "will be able to") perform the job with reasonable accommodations.  Nothing in the text of the reasonable accommodation provision requires an employer to wait for an indefinite period for an accommodation to achieve its intended effect.  Rather, reasonable accommodation is by its terms most logically construed as that which, presently, or in the immediate future, enables the employee to perform the essential functions of the job in question.

*Id.* (quoting *Myers*, 50 F.3d at 283).

Because the plaintiff in *Duckett* "had already been on medical leave for ten months . . . and had no way of knowing when his doctor would allow him to return to work in any capacity," we concluded that his requested accommodation of additional medical leave was not reasonable.  *See id.* at 1226.  Nevertheless, we noted that more compelling facts might lead to a different result, such as "if an employee was terminated immediately upon becoming disabled without a chance to use his leave to recover."  *Id.* n.2.

11

After *Duckett*, we held in *Wood* that a plaintiff's request for a leave of absence to recover from cluster headaches was not reasonable. 323 F.3d at 1314. We explained that *Duckett* had held "that an accommodation is unreasonable if it does not allow someone to perform his or her job duties in the present or in the immediate future." *Id.* at 1313. Thus, "a leave of absence might be a reasonable accommodation in some cases" if it would allow an employee to continue work "in the immediate future." *Id.* at 1314. But an accommodation is unreasonable if it would only allow an employee to "work at some uncertain point in the future." *Id.*

Based on these standards, we held that Wood's requested accommodation was not reasonable because he was essentially requesting indefinite leave. *Id.* Even with a leave of absence, "he could be stricken with another cluster headache soon after his return and require another indefinite leave of absence." *Id.* Thus, Wood was not requesting an accommodation that would have allowed him to continue to work presently, "but rather, in the future—at some indefinite time." *Id.* We also distinguished *Duckett*'s "parenthetical[] not[ation] that more compelling facts might lead to a different result," stating that Wood had not been "terminated immediately upon becoming disabled," but rather "had been granted years of discretionary leave and had been on a discretionary leave for over one month at the time of his termination." *Id.*

12

Here, Billups's situation is different from that of the plaintiffs in *Wood* and *Duckett* because his disabling condition was temporary, not chronic.[3]  *Cf. Wood*, 323 F.3d at 1312 (fourteen-year history with cluster headaches); *Duckett*, 120 F.3d at 1223–24 (ten-year history with high blood pressure).  In other words, Billups's condition was likely to be fully corrected, or nearly so, at some point in the future.  Nevertheless, we cannot say, on this record, that the requested accommodation was reasonable under the legal standards set out in *Wood* and *Duckett*.

As explained above, an accommodation is unreasonable under our precedent unless it would allow the employee to "perform the essential functions of their jobs presently or in the immediate future."  *Wood*, 323 F.3d at 1314.  It is undisputed that Billups was unable to perform the essential functions of his position as of the date of his termination.  And the record shows that Billups was essentially requesting a leave of absence that would allow him to work "at some indefinite point" in the future.  *See id.*

At the predetermination hearing on June 19, 2014, Billups did not request a specific period of time in which to recover, nor would it have been reasonable to expect him to.  He was still participating in physical therapy and it was unclear when he would be cleared to return to work without the limitations that rendered

---

[3] We assume, as the district court did, that Billups's temporary restrictions on lifting, pushing, and pulling constitute a "disability" within the meaning of the ADA.  *See* 29 C.F.R. § 1630.2(j)(1)(ix) (noting that an impairment lasting or expected to last less than six months can in some circumstances qualify as a disability).

13

him unable to perform the essential functions of the UST-2 position.  While the surgeon indicated in late May 2014 that Billups might be able to return in mid-July, Billups was not scheduled to see the surgeon again until July 8.  And according to his physical therapist, Billups was not projected to be discharged from physical therapy until July 21, 2014.  Thus, at best, there was a possibility, but no certainty, that Billups could return to work by mid-July 2014.

The record also shows, however, that Billups likely still would not have been able to perform the essential functions of the UST-2 position at that time.  As Billups foreshadowed at the hearing, his physician in mid-July 2014 limited him to lifting no more than twenty pounds overhead and advised him to complete all work with his arms close to his body.  According to Dawson, those limitations would have prevented Billups from performing the essential functions of the UST-2 position.  Although Billups believed he could perform the job with those limitations, his testimony reflects that he could only perform "most" of the work, but not all of it.  And even a "relative[ly] infrequen[t]" inability to perform a job's essential functions is enough to render a plaintiff not a "qualified individual" under the ADA.  *Holbrook v. City of Alpharetta,* 112 F.3d 1522, 1528 (11th Cir. 1997).  Nor would Emerald Coast have been required to "reallocate . . . an essential part of his job" to another employee.  *Id.*

14

Thus, Billups's request for additional leave was essentially an open-ended request for "sufficient time to ameliorate his conditions" following the surgery. *See Duckett*, 120 F.3d at 1226. Indeed, the record shows that he continued to attend physical therapy until August 13, 2014, and that he was not cleared to return to work without restriction until October 23, 2014. We also note that Billups was not "terminated immediately upon becoming disabled," *see id.* at 1226 n.2, but rather received over six months of medical leave to allow recovery. That period of time ultimately was not sufficient, largely as a result of the surgery's delay through no fault of Billups's own. Nevertheless, in light of Emerald Coast's allowance of six months of leave and the uncertainty about when Billups could perform the essential functions of his position in the future, Billups has not shown that a reasonable jury could conclude that he was denied a reasonable accommodation that would have allowed him to perform the essential functions of his job either presently or in the immediate future. *See Wood*, 323 F.3d at 1314.

Billups's argument that Emerald Coast applied a general rule without conducting an "individualized assessment" of his needs is off the mark. *See Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1262–63 (11th Cir. 2007) ("Allowing uniformly-applied, disability-neutral policies to trump the ADA requirement of reasonable accommodations would utterly eviscerate that ADA requirement."). While Emerald Coast's policy provides, as a general rule, six months for an

employee who suffered an on-the-job injury to return to employment, it also expressly incorporates an individualized assessment of the employee's ability to work: "The department head, after consultation with the Human Resources Director, may extend this time based on evaluation of the employee's ability to work." In addition, at the hearing, Emerald Coast considered the specifics of his situation and allowed him to submit medical records and other evidence. Emerald Coast then terminated him because he could not perform the essential functions of the position. For the reasons explained above, that decision did not violate the ADA.

Because we conclude that Billups was not a "qualified individual" under the ADA, we do not address whether Emerald Coast has presented sufficient evidence of undue hardship. We also do not address Billups's arguments regarding pretext, which are not, in any event, directly relevant to a reasonable-accommodation claim.[4]  *See Holly*, 492 F.3d at 1262 (explaining that there is no "additional burden" to show pretext when proving a reasonable-accommodation claim).

---

[4] Billups's argument appears to be that Emerald Coast terminated him because it regarded him as disabled based on his record of on-the-job injuries, and that its proffered reason for his termination—his inability to perform the essential functions of the position—is pretextual. But as he concedes, there is no requirement to provide reasonable accommodations where an employee is only regarded as disabled, *see* 42 U.S.C. § 12201(h), and it is undisputed that Billups was unable to perform the essential functions of his position at the time of his termination. Accordingly, Billups's regarded-as claim fails at the *prima facie* stage because he is not a "qualified individual" under the ADA. *See Mazzeo*, 746 F.2d at 1268.

Accordingly, we affirm the district court's grant of summary judgment on Billups's ADA claim.

## V.

Finally, we address Billups's state-law claim alleging unlawful retaliation for pursing worker's compensation benefits.  Under Fla. Stat. § 440.205, "[n]o employer shall discharge, threaten to discharge, intimidate, or coerce any employee by reason of such employee's valid claim for compensation or attempt to claim compensation under the Workers' Compensation Law."  However, "[t]he statute cannot be interpreted to prohibit the discharge of an employee for any reason once the employee has filed or pursued a workers' compensation claim."  *Pericich v. Climatrol, Inc.*, 523 So. 2d 684, 685 (Fla. Dist. Ct. App. 1988).

Retaliation claims brought pursuant to § 440.205 require a plaintiff to show the following: (1) he engaged in protected expression; (2) he suffered an adverse employment action; (3) a causal connection exists between the expression and the adverse action.  *Ortega v. Eng'g. Sys. Tech., Inc.,* 30 So. 3d 525, 528 (Fla. Dist. Ct. App. 2010).  Billups met the first two elements.  As to the third element, for purposes of establishing a *prima facie* case, the plaintiff must show that "the protected activity and the adverse action are not completely unrelated," which can be satisfied through close temporal proximity.  *Id.* at 529.

17

If the plaintiff establishes these elements as a *prima facie* matter, the burden shifts to the employer to proffer a legitimate reason for the adverse employment action. *Id.* At that point, the plaintiff bears the burden of showing that the employer's reason is pretext for retaliation. *See id.*

Here, the district court properly granted the Authority's motion for summary judgment on Billups's retaliation claim. First, we agree with the court that the temporal proximity between Billups worker's compensation claim and his termination—over six months—was not sufficiently close to establish a causal connection. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) ("A three to four month disparity between the statutorily protected [activity] and the adverse employment action is not enough.") (Title VII case).

Second, even assuming *arguendo* that Billups made out a *prima facie* case, he has not shown that Emerald Coast's stated reason for his termination is unworthy of credence.[5] While Billups's evidence indicates that Dawson was concerned about Billups's record of on-the-job injuries, the record evidence is undisputed that, at the time of his termination, and following an extended period of medical leave, Billups simply was unable to perform the essential functions of his job. Billups's termination was consistent with Emerald Coast's express policy.

---

[5] The district court did not reach the issue of pretext, but the record is sufficiently developed for us to decide the issue. *See Cuddeback v. Fla. Bd. of Educ.*, 381 F.3d 1230, 1236 n.5 (11th Cir. 2004) (stating that we may address the issue of pretext in the first instance if the record is sufficiently developed).

18

And on appeal Billups does not point to any comparator evidence showing that Emerald Coast retained an employee who did not have a history of on-the-job injuries, after six months of medical leave despite an inability to perform the essential functions of the position. Thus, despite Dawson's comments about Billups's injuries, Billups has not "has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *See Ortega*, 30 So. 3d at 529 (quotation marks omitted). Accordingly, we affirm the district court's grant of summary judgment on Billups's retaliation claim.

## VI.

For the reasons stated, the district court properly granted summary judgment in favor of Emerald Coast on Billups's claims of discrimination in violation of the ADA and retaliation in violation of the Florida Workers Compensation Law.

We therefore **AFFIRM** the judgment of the district court.